STREIGHT RADIO AND TELEVISION, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60675. Filed October 26, 1959.

128

*John H. O'Hara, Esq.*, for the petitioner.
*Robert E. Johnson, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency in petitioner's income tax for the fiscal year ended October 31, 1950, in the amount of $14,245.82.

The issues are:

(1) Whether petitioner may exclude from gross income for the fiscal year 1950 the amount of $43,471.33 or any part thereof, the amount deferred by petitioner as unearned income resulting from a "Service Guarantee"; and

(2) Whether petitioner is entitled to a bad debt deduction for the fiscal year 1950 in the amount of $14,352.46, which amount was claimed as an addition to a previously nonexistent reserve for bad debts.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner is a corporation organized on August 1, 1949, and existing under the laws of the State of Indiana with its principal office in Gary, Indiana. It kept its books and filed its corporate income tax returns for the period from August 1, 1949, to October 31, 1949, and the fiscal years ended October 31, 1950 and 1951, on an

accrual basis of accounting with the collector of internal revenue for the district of Indiana.

Eugene R. Streight, petitioner's president, hereinafter referred to as Streight, owned 62 shares, and a member of his family, Christine Streight, owned the remaining 61 shares of petitioner's capital stock.

Streight had worked in the radio business from 1922 until the beginning of World War II. During the war, he served in the Navy and gained knowledge of television through working with radar. In 1946, he started a radio and television business in Gary, an individual proprietorship which petitioner took over on August 1, 1949.

Because of a flood in the basement of petitioner's business premises, detailed records of petitioner were not made available to respondent for any periods prior to March 1, 1950. All records relevant to the instant case which petitioner had in its possession were made available to respondent either on the first or subsequent occasions on which he examined petitioner's records.

## Issue 1.

Petitioner, during the taxable year, was engaged in the business of selling television sets and of servicing the sets sold.

Most of the television sets sold by petitioner in 1950 were designed by their manufacturers so that, periodically, the chassis would have to be removed, and the tuners, glass, and picture tube cleaned. This service was required every 2 to 6 months, depending on the amount of soot and dirt in the air which varied according to the distance between the location of the set and the steel plant in Gary. Petitioner rendered this periodic cleaning service upon call by its customers. Furthermore, television was relatively new in the Gary area, and a local station had considerable difficulty with a low signal and other problems which adversely affected television reception; consequently, petitioner's customers would often call upon petitioner for services, being under the impression that these reception difficulties were due to some fault of their receivers. Less than 100 of the several thousands of television sets sold during the taxable year did not require service of one kind or another.

Petitioner advertised its television sets at the list price, which was the manufacturer's suggested retail price. However, beginning with and during the entire taxable year and during the following year when customers called to purchase sets, petitioner would offer an "Installation and Service Contract" for an additional consideration, which varied in amount from $65 to $100, depending on the make and model of the receiver sold. The price of the service contract was the same standard price charged by the different manufacturers for

performing the same services. Petitioner added the charge for the service contract to the list price to arrive at a single total sales price for the set.

These service contracts provided, *inter alia*, as follows:

In consideration of the payment by the Purchaser to the undersigned STREIGHT TELEVISION of the sum of $_____, the Dealer agrees to furnish a STANDARD INSTALLATION (including antenna) for the television receiver designated above at the Purchaser's address shown below and to furnish to the Purchaser all labor, materials, replacement parts and tubes (including the picture tube) necessary for the proper operation and maintenance of said television receiver and of the antenna at the point of original installation for a period of_____from the date of installation to satisfactorily receive television broadcasts from those existing stations within a normal television broadcast service area which are in scheduled operation at the time of this installation, provided that no person other than said Dealer or his authorized representative has rendered service on or installed materials in said receiver or antenna. *This agreement does not apply, however, to services rendered or parts furnished to remedy damage occasioned by other than normal usage of the receiver or antenna or by misuse or abuse of the same, or by fire, storm or other casualty, for which an extra charge will be made.*

In the event that special circumstances at the point of original installation require a SPECIAL INSTALLATION (including antenna) for the proper operation of such television receiver, the Dealer will promptly notify the Purchaser of such fact and of the additional charges to the Purchaser for providing such SPECIAL INSTALLATION. If the Purchaser then authorizes the Dealer to proceed with such SPECIAL INSTALLATION, the Purchaser agrees to pay to the Dealer the additional charges therefor; otherwise this contract shall be considered cancelled and the Dealer will refund to the Purchaser so much of the contract price as has been paid. The Purchaser understands and accepts as a part of this contract all of the conditions forming a part of this contract contained on the reverse side hereof.

Among the nine numbered conditions on the reverse side of the contract were the following:

3. The Dealer will install, adjust, and place the equipment in proper operating condition, instructing the Purchaser in the operation and care of the receiver.

4. The Dealer will service and maintain the receiver in normal working order for a period of one year from date of installation, provided that such service and maintenance are necessitated by normal usage, replacing all defective materials, parts, and tubes.

5. The Dealer agrees to make such adjustments within one year after installation as may be necessary to receive telecast from new stations. It is agreed, however, that if it becomes necessary to remove, add to or replace any part of the antenna system, it will be done on the basis of a reasonable charge for additional materials and labor.

6. This agreement covers the installation where originally installed, and the Dealer assumes no responsibility for its performance if moved to any other location.

\*       \*       \*       \*       \*       \*       \*

8. It is also understood that any repairs or alterations made necessary by reason of conditions beyond the control of the Dealer shall be made by the Dealer at a reasonable charge for labor and materials.

Petitioner gave the service contracts to its customers, without having any copies made for itself. The customer was also given a sales ticket, which reflected the total sales price, as a receipt. The fact that a service warranty had been given was often not recorded on the sales ticket due to the rapid manner in which the sales were made. If a customer purchased a set, he would receive notice of the warranty even if it was not recorded on the sales ticket because evidence of it would be recorded on the delivery card. A delivery card was made up for each television set sold by petitioner during the taxable year.

These delivery cards were always in the same standard form, providing spaces for the customer's name and address, a description of the receiver sold, the name of the salesman, the names of petitioner's employees installing the set and the antenna, and the dates that delivery was ordered and installation was completed. Further, it provided two adjoining spaces designated "Parts" and "Time" and two other spaces immediately below them designated "Service" and "Time." Where a service contract was sold along with the set, these spaces were filled in to designate the warranty period, that is, the period during which the service contract provided free service and parts. The delivery cards further provided, *inter alia:*

USE THIS TICKET IF INSTALLING INSTRUMENT ORDERED

\*     \*     \*     \*     \*     \*     \*

I/we the purchaser's hereby agree that Television, Radio, Record Player, now installed is the one ordered, the antenna was installed in a workmanlike manner, and the above instrument was in good working condition at the time of installation.

_____

Purchaser Sign Here

Petitioner kept the delivery cards as its record of the service contract. These cards for sales made after March 1 of the taxable year were available to respondent for examination. While the sales tickets were put into daily packets and stored in the basement of petitioner's premises, some of these tickets representing sales in the taxable year were also available to respondent for examination. Respondent's agents examined 25 sales tickets which represented 2 days' sales; 18 of these tickets did not contain any reference to any warranty. However, 5 of these latter 18 tickets were checked by respondent's agent against the corresponding 5 delivery cards; 1 of those delivery cards showed a 90-day service and parts warranty, with a 1-year warranty on the picture tube, another disclosed a "coupon" warranty, 1 showed

a 1-year parts warranty, and 2 provided for a 1-year service warranty. Respondent's agent examined the delivery cards for customers with initials A through BE, approximately 200 cards. All but 22 of these delivery cards disclosed a 1-year service warranty. Of those 22 cards, 1 did not record any warranty, 1 recorded a 1-year parts warranty, and 20 disclosed 90-day warranties, either on parts or service, or on both.

A few sets sold for cash were sold without any service contracts. However, none of the sets sold on credit were sold without a service contract because otherwise, if such a set failed to work properly, the customer probably would have refused to continue payments. The main reason that 90-day rather than 1-year service contracts were occasionally given was that a customer would not want to pay the additional $65 for the 1-year contract. A relatively insignificant number of sets were sold with the 90-day rather than the 1-year service contract, and usually, petitioner's customers wanted the service and were willing to pay for the 1-year contract. All but 10 per cent of the sets sold by petitioner during the year in question were sold with a 1-year service contract.

Petitioner's main purpose in offering the service contracts was to induce potential customers to purchase their sets from petitioner. Petitioner was not in the business of servicing, and it did not service television sets sold by other concerns, as it knew from the experience of such competitors that such a service business was not profitable.

When a customer called for service on his set, petitioner determined whether or not the customer was entitled to free service by checking the date of purchase as recorded on the delivery card to see if the warranty period had elapsed. Generally, a customer would be charged for any services rendered after the warranty period provided in the service contract had expired. However, if a customer had not received any services during the warranty period and this period had only expired a few months before the service call was made, he would usually not be charged. In some cases, if little or no service had been rendered during the warranty period, petitioner would extend gratuitously the warranty period for another 8 months, or give the customer a refund or credit on account, in the amount of $15 or $20.

According to the books and records and income tax returns of petitioner, its television, service contract, and other service and repairs sales, and the costs of producing those sales, for its 1950 and 1951 fiscal years, were as follows:

| Total sales: | Fiscal year ended Oct. 31 | |
| --- | --- | --- |
| | 1950 | 1951 |
| Television sales (includes service contracts) | $1,044,554 | $458,712 |
| Service and repairs | 37,890 | 84,417 |
| Total | 1,082,444 | 543,130 |
| Service sales: | | |
| Service contracts | 156,247 | 68,807 |
| Less: "Service Guarantee" | 43,471 | (21,735) |
| Other services and repairs | 37,890 | 84,417 |
| | $150,666 | $174,959 |
| Service costs: | | |
| Materials | 60,266 | 69,984 |
| Labor | 87,540 | 91,693 |
| Truck maintenance | 3,720 | 4,989 |
| Depreciation | 2,033 | 3,336 |
| | 153,559 | 170,002 |
| Service gain (or loss) | (2,893) | 4,957 |

The manufacturers of the sets warranted the picture tube for an undisclosed period, and the other tubes for 3 months.

Louis Goedecke, an accountant, was an employee of a firm of certified public accountants employed by petitioner but was not himself a certified public accountant. Goedecke made the monthly posting entries from the monthly summaries to the general ledger of petitioner, and prepared petitioner's income tax returns for the fiscal periods ended October 31, 1949, 1950, and 1951.

While the charges for the service contracts varied in amount from $65 to $100, most of the contracts were sold for $65. The list prices of the sets varied from $249 to $725. The charges for the service contracts had been included in total sales without allocation. Goedecke computed the amount of income from the service contracts to be deferred in the following manner. It was determined that the service contract charge, on the average, constituted 14.7 per cent of the total price. This computation was made without weighing the different total prices according to the relative quantity of each type of receiver sold. Goedecke then took 15 per cent of each month's total sales as representing amounts charged for the service contract. Antenna and labor costs of installation, covered by the service contract, were estimated to be $22.50 per set installed, or almost one-third of $65, which was assumed to be the total amount charged for the service contract. The amounts charged for the service contracts for each month were accordingly reduced by one-third, on the theory that the amount of $22.50 of the $65 charged for the contract represented income earned at the time of installation. The remaining balance for each month, which thus equaled 10 per cent of television sales for the month, was then divided by 12, the service contract period, in months, and the

resulting monthly figure was multiplied by the number of months the service contracts would remain in effect after the close of the fiscal year. The total of these figures was then deferred as unearned income.

During the taxable year, petitioner's television sales and charges for service contracts, less refunds in the amount of $7,908.42 totaled $1,041,649.50. This amount does not include other unexplained sales of approximately $2,905, and service and repair income not covered by service contracts in the amount of $37,890.26. At the end of the fiscal year, total uncollected contracts receivable had been reduced to $287,049.30.

The following schedule prepared by Streight and Goedecke at the end of the taxable year for the purpose of reporting petitioner's income for that year discloses the amounts deferred as unearned income and the computation of those amounts:

SCHEDULE OF DEFERRED INCOME 10–31–50

| Months of year | Total sales | Service contract income 15% | Antenna installation ⅓ | Balance | Per month | Months remaining next year | Deferred income [1] |
|---|---|---|---|---|---|---|---|
| November | $140,474.56 | $21,071.18 | $7,023.87 | $14,047.31 | | | |
| December | 147,916.04 | 22,187.40 | 7,395.84 | 14,791.56 | $1,232.63 | 1 | $1,232.63 |
| January | 52,928.44 | 7,939.26 | 2,646.42 | 5,292.84 | 441.07 | 2 | 882.14 |
| February | 107,203.60 | 16,080.54 | 5,360.22 | 10,720.32 | 893.36 | 3 | 2,680.09 |
| March | 87,972.77 | 13,195.91 | 4,398.71 | 8,797.20 | 733.10 | 4 | 2,932.42 |
| April | 65,175.69 | 9,776.35 | 3,258.79 | 6,517.56 | 543.13 | 5 | 2,715.65 |
| May | 52,632.35 | 7,894.85 | 2,631.65 | 5,263.20 | 438.60 | 6 | 2,631.61 |
| June | 42,818.65 | 6,422.79 | 2,140.95 | 4,281.84 | 356.82 | 7 | 2,497.74 |
| July | 61,621.58 | 9,243.23 | 3,081.11 | 6,162.12 | 513.51 | 8 | 4,108.08 |
| August | 81,861.70 | 12,279.25 | 4,093.09 | 8,186.16 | 682.18 | 9 | 6,139.62 |
| September | 93,313.38 | 13,997.00 | 4,665.68 | 9,331.32 | 777.61 | 10 | 7,776.10 |
| October | 107,730.74 | 16,159.61 | 5,386.61 | 10,773.00 | 897.75 | 11 | 9,875.25 |
| Total | 1,041,649.50 | 156,247.37 | 52,082.94 | 104,164.43 | | | 43,471.33 |

[1] Headings of columns added or clarified.

On its return for the taxable year, petitioner deferred the amount of $43,471.33 charged for service contracts by including that amount in its cost of goods sold. In his notice of deficiency, respondent determined "that the deduction for service guarantee * * * created by setting up a contingent liability account * * * is not an allowable deduction" and increased petitioner's income accordingly.

In consideration of the amounts charged by petitioner for the service contracts, petitioner was obligated to render any of the services required over the periods provided by the contracts. Since some of these periods extended into the subsequent taxable year, petitioner was obligated to that extent to render services beyond the taxable year.

Because 10 per cent of petitioner's sales were made without service contracts, the amount deferable according to petitioner's theory as representing petitioner's future obligations, $43,471.33, should be re-

duced by 10 per cent, or to the figure of $39,124.20. For the same reason, while uncollected sales as of the end of the year totaled $287,049.30, only the amount of $258,344.37 of such sales are found to have been made with service contracts. Because, after exclusion of the antenna installation charges, the amount deferred represented 10 per cent of sales, applying the same percentage to uncollected sales, only $25,834.44 of the amount deferable by petitioner's theory (corrected to $39,124.20) was uncollected as of the end of the year. The difference between the amount actually deferred, $43,471.33, and the uncollected amount, $25,834.44, or $17,636.90, was received during the taxable year without restriction as to use.

At the time of entering into the service contracts, petitioner acquired a substantially fixed and unconditional right to receive the amounts charged therefor.

### Issue 2.

When petitioner took over the business of the sole proprietorship of Streight, it accepted accounts receivable in the amount of $4,800 representing service charges and miscellaneous accounts. On August 1, 1949, accounts receivable were increased to $6,020.57, the additional $1,220.57 representing advances to Streight. Petitioner's balance sheet as of October 31, 1949, did not list a reserve for bad debts.

During petitioner's fiscal period ended October 31, 1949, it discounted its contracts receivable with recourse with the Commercial Credit Company. The predecessor proprietorship had also followed this practice, and petitioner had assumed the proprietorship's liabilities to the Commercial Credit Company. Petitioner was required to purchase back from the credit company an undetermined number of these contracts representing sales made by Streight in his individual proprietorship prior to incorporation, when customers failed to make payments. When contracts were so returned to petitioner, it would repossess the sets, and sell them at their fair market value.

In preparing petitioner's income tax return for the fiscal period ended October 31, 1949, Goedecke did not establish a bad debt reserve because he did not know of any bad debts incurred by petitioner for that period. At the time of the trial, petitioner did not have available any records of bad debts it may have incurred prior to March 1, 1950.

During the taxable year, petitioner carried its contracts receivable itself instead of discounting them with a commercial house. Since March 1, 1950, petitioner has maintained a daily summary sheet which included the day's receipts for cash and contract sales and services and also any "charge-offs" due to returned merchandise, bad debts, and miscellaneous reasons. These charge-offs were applied to the daily receipt totals and the resulting figure was recorded on peti-

tioner's books as the daily sales figure. This figure was entered on a monthly summary, the totals of which were posted to the ledger. During the taxable year, no specific bad debts were charged on petitioner's books to its "bad debt account."

When a television set was repossessed for failure to make payments, the balance owing on that account was written off by the making of an appropriate journal credit; this amount was then charged against sales on the daily summary sheet, thus reducing daily sales by the amount uncollected. If a repossessed set was sold, the sale was entered in the sales account at the price for which the set was then sold. Invariably, the fair market value of a repossessed set was less than the balance owing on it, and usually losses were realized on such transactions. Upon repossession or resale of a set, its then fair market value was not recorded at its cost; instead, costs of merchandise sold were determined by taking inventory at the end of the year. The result of this method of recording the repossessions and resales was that any losses resulting therefrom were reflected in a corresponding reduction in daily sales, and thus income.

On October 31, 1950, petitioner's contracts receivable totaled $287,049.30. On that date, Goedecke set up a reserve for bad debts on petitioner's books by making entries to a bad debt expense account and to the reserve in amounts equal to 5 per cent of the outstanding contracts receivable, or $14,352.46.

The reserve for the following year was also computed at 5 per cent of outstanding contracts receivable; the amount by which the reserve was reduced accordingly was taken into income for that year.

OPINION.

## Issue 1.

Petitioner contends that respondent erred in including the amount deferred in gross income of the taxable year on the ground that it represented unearned and unreceived income, that the deferral thereof clearly reflected income, in accordance with the method of accounting regularly employed,[1] and further, that its inclusion results

---

[1] The relevant statutory provisions of the Internal Revenue Code of 1939 are the following sections:

SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *

SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

(a) GENERAL RULE.—The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period.

All references to sections are to sections of the Internal Revenue Code of 1939.

in a distortion of income, because the expenses incident thereto had not yet been incurred. Respondent contends that the amount deferred was properly includible in income of the taxable year because received under a "claim of right" without any restriction as to its use. *Automobile Club of Michigan*, 20 T.C. 1033 (1953), affd. 230 F. 2d 585 (C.A. 6, 1956), affd. 353 U.S. 180 (1957).

While we do not agree with respondent that the entire amount was received during the year, we do agree that it is includible in income for the taxable year.

Petitioner deferred the amount of $43,471.33 as unearned income from service contracts. We have found that only the amount of $39,124.20 represented amounts charged for service contracts; accordingly, the difference, in the amount of $4,347.13, is not deferable, according to petitioner's theory, or in any event, and we are here concerned only with the corrected amount of $39,124.20.

Both parties have assumed that the question of whether or not the amount was received during the taxable year is of paramount importance in deciding whether the amount is properly accruable; accordingly, we have made findings disposing of their respective contentions regarding that question.

However, under this Court's decisions, the question of receipt is not controlling in the instant case. The decisive question is the nature of petitioner's right to the contract amounts when the service contracts were entered into. If at that time, which either corresponded to or preceded receipt in each instance of contracting, petitioner's right to the contract amount was substantially fixed and determined, such amount was then properly accruable, and present or later receipt is immaterial. *Mark E. Schlude*, 32 T.C. 1271 (1959).

While the amount in question was unearned, as petitioner contends, in a strict accounting sense, in that the petitioner had not satisfied the corresponding contractual liability to render future services, this fact is not necessarily controlling of the issue before us. Our only concern is whether or not respondent abused his statutory discretion in determining that deferral of the amount did not clearly reflect income, section 41, see *Automobile Club of Michigan, supra*, which depends on the nature of petitioner's right to receive the amount when contracted for, as stated above, an inquiry involving factual and practical considerations.

Petitioner has proved only that it had assumed a liability to perform services of indefinite extent in the future. It has not proved even the approximate amount of such liability, or shown that it was capable of estimation. Total service costs were $153,559; however,

petitioner did not attempt by any method to segregate service costs allocable to services rendered pursuant to the service contracts, and those rendered independently of such contracts, which were considerable, accounting for service sales in the amount of $37,890. Except for the periodic cleaning services, we know only that most of the sets sold would require some service at some indefinite time. While petitioner had a policy of making refunds where little or no service was given during the warranty period, it was not obliged to make them, and there is no evidence that it set aside any funds for this purpose. Petitioner has thus failed to prove that the method of deferral used bore any significant relation to the services to be performed. Accordingly, petitioner has failed to prove that respondent has abused his discretion in determining that accrual rather than deferral of the amount in question in the taxable year clearly reflected income. Sec. 41; see *Automobile Club of Michigan*, *supra*. For these same reasons, *Bressner Radio, Inc.* v. *Commissioner*, 267 F. 2d 520 (C.A. 2, 1959), reversing 28 T.C. 378 (1957) is factually distinguishable.

Petitioner has proved that the amount in question was included in and considered a part of total credit sales (to what extent they were deferred payment or installment sales is not known). However, proving that this amount was uncollected and would become due and payable as a part of credit sales does not justify deferral because it in no way alters the nature of these charges as amounts owing on contracts receivable.

It is true that this amount was owed in consideration of service contracts not yet expired but this in no way affected petitioner's unconditional right to receive it, because it did not affect the customers' obligations to make payment of such amount. Petitioner's customers, when they contracted to purchase the sets and the service contracts, became obligated to pay the full sales price, which included the service contract charges. While petitioner had not performed and it was conceivable that it might not be able to perform the services contracted for in the future, that contingency is so slight in the factual situation presented that it did not materially affect petitioner's right to the amount in the taxable year. Tax accounting does not concern itself with the fine question of whether items have been "earned" in the accounting sense, see *Automobile Club of New York, Inc.*, 32 T.C. 906 (1959), and this is true whether the item in question has been received, or is merely a receivable. *Mark E. Schlude, supra.*

We have decided on the facts before us that petitioner's right to this amount was substantially fixed and unconditional in the taxable year, whether payment was to be made presently or in the future,

according to whatever credit agreements were made, and the entire amount in question is properly accruable in the taxable year. *Mark E. Schlude, supra;* cf. *Your Health Club, Inc.,* 4 T.C. 385 (1944).

In his deficiency notice, respondent determined that "the deduction for service guarantee * * * created by setting up a contingent liability account * * * is not an allowable deduction." However, in fact, petitioner did not compute or claim a deduction "in accordance with the method of accounting regularly employed" but instead, included in its cost of goods sold, the amount of income it considered properly deferable. Petitioner now contends that if the amount received is held to be includible in income of the taxable year, it is entitled to a deduction for estimated expenses arising from its liability to render the future services. Secs. 23(a)(1)(A) and 43. Petitioner's liability was to render future services, the extent of which was largely contingent upon customers calling for such services. Further, as previously stated, petitioner has failed to prove that the amount of such expenses was reasonably ascertainable. Petitioner has failed to prove that "all the events" fixing liability and the amount thereof with reasonable certainty occurred during the taxable year; accordingly, we hold that the expenses were not incurred and were not properly accruable in the taxable year. *Brown v. Helvering,* 291 U.S. 193 (1934); *United States v. Anderson,* 269 U.S. 422 (1926).

*Issue 2.*

Petitioner contends that it did not deduct any bad debts for the fiscal period ended October 31, 1949, and it is therefore not precluded from deducting an addition to a reserve for bad debts for the taxable year. Respondent maintains that petitioner directly charged off bad debts on the daily summary sheet for the fiscal period ended October 31, 1949, as well as for the taxable year, and having elected this method, it cannot use the reserve method without obtaining permission from respondent. Further, he contends that petitioner cannot, in any event, reduce sales by specific bad debts and also claim an addition to a reserve for bad debts in the taxable year. Sec. 23(k)(1); Regs. 111, sec. 29.23(k)–1(a); *Union Bleachery v. United States,* 176 F. 2d 517 (C.A. 4, 1949); *Rogan v. Commercial Discount Co.,* 149 F. 2d 585 (C.A. 9, 1945).

We agree with respondent.

The statute provides that the respondent may, in his discretion, allow as a deduction an addition to a reserve for bad debts in lieu

of a deduction for debts actually becoming worthless within the taxable year.[2]

Petitioner's contention that it suffered and deducted no bad debts during the fiscal period ended October 31, 1949, has not been proven. During that period it assigned its sales contracts receivable with recourse to a commercial house and assumed the proprietorship's liabilities for similar assignments. It had to repurchase an indefinite number of these receivables and repossess the sets, which invariably had fair market values less than the amounts owing, upon failure to collect the amounts due. Petitioner then sold the sets at their fair market values, which usually resulted in not recovering the full amount owing on the original sale. As stated in our findings, petitioner's method of recording such repossessions and resales resulted in a reduction of sales by the amount of the debt never collected, and consequently a bad debt deduction for the periods when such events occurred. Petitioner has not proved that these events did not occur during the fiscal period ended October 31, 1949; it has not been proven that some other method was used during that period. Therefore, petitioner has failed to prove that it did not deduct bad debts directly through such reductions in sales during the fiscal period ended October 31, 1949. In the absence of such proof, we hold that petitioner was subject to the rule requiring permission from respondent to change to the method of deducting bad debts by an addition to the reserve. Reg. 111, sec. 29.23(k)–1(a), *supra*, footnote 2. Petitioner has neither requested nor obtained such permission.

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

*     *     *     *     *     *     *

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *

Regs. 111, sec. 29.23(k)–1(a)(2).

Taxpayers were given a similar option for 1921 to select either of the methods mentioned for treating such debts. (See article 151, Regulations 62.) * * * A taxpayer filing a first return of income may select either of the two methods subject to approval by the Commissioner upon examination of the return. If the method selected is approved, it must be followed in returns for subsequent years, except as permission may be granted by the Commissioner to change to another method. Application for permission to change the method of treating bad debts shall be made at least 30 days prior to the close of the taxable year for which the change is to be effective. * * *

*     *     *     *     *     *     *

Sec. 29.23(k)–5. RESERVE FOR BAD DEBTS.—Taxpayers who have established the reserve method of treating bad debts and maintained proper reserve accounts for bad debts, or who, in accordance with section 29.23(k)–1, adopt the reserve method of treating bad debts, may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of a deduction for specific bad debt items.

*     *     *     *     *     *     *

A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business transactions) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have become wholly or partially worthless and have been charged against the reserve account.

Further, since the record discloses affirmatively that such repossessions and resales did occur during the taxable year, petitioner has in effect deducted specific bad debts through the corresponding reduction in daily sales for such year. The statute and relevant regulations provide the general rule that a direct deduction for bad debts, and a deduction for an addition to the reserve are allowed only in the alternative. Even assuming, *arguendo*, that petitioner neither incurred nor deducted bad debts in the preceding fiscal period, so that the question of obtaining permission for a change in method is not present, petitioner has suggested no reason nor introduced evidence to suggest any reason why an exception to the general rule should be made.

We hold that petitioner has failed to prove that it is entitled to a deduction for an addition to the reserve, or to any further deduction for bad debts for the taxable year.

*Decision will be entered for the respondent.*