AMERICAN COMMUNITY BUILDERS, INC., PETITIONER, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84548.  Filed May 25, 1961.

*Lester Reinwald, Esq.*, and *Charles Melvoin, Esq.*, for the petitioner.
*David M. Robinson, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax of the petitioner in the amounts of $374,903.24 and $97,086.71 for the fiscal years ended June 30, 1953, and June 30, 1954, respectively. The sole issue to be decided is whether a "10-day letter" received by petitioner was a written notice of a proposed deficiency within the meaning of section 3(b), Pub. L. 86-459 (May 13, 1960), which would make 1953 petitioner's "year of change" in accounting method in applying section 481 of the 1954 Code.

### FINDINGS OF FACT.

The stipulated facts are incorporated herein by reference.

Petitioner, a corporation, was organized under the laws of the State of Illinois on July 30, 1946, to engage directly or through subsidiaries, in the business of erecting and renting apartments, commercial and industrial properties, building and selling homes in the regular course of its trade or business, acting as general contractors, land developers, rental and sales agents, and otherwise engaging in general real estate activities. Petitioner and each of its wholly owned subsidiaries keep their books on an accrual method of accounting, which accrual method is also used in the preparation of the consolidated income tax returns of the petitioner and its subsidiaries, on a fiscal year basis commencing July 1 of each year and ending on June 30 of the following year. The Federal income tax returns for the years ended June 30, 1953, and June 30, 1954, were consolidated returns of petitioner and all of its wholly owned subsidiaries, of which Park Forest Homes, Inc., was one, and the returns were filed with the director of internal revenue at Chicago, Illinois.

The developments undertaken by petitioner and its subsidiaries were on an extensive scale and gave rise to a community located on the southern outskirts of the Chicago area, known as Park Forest, Illinois. By the end of 1950, subsidiaries of petitioner had completed 3,010 rental units; during the fiscal year ended June 30, 1953, there were 1,091 homes sold in a price range from approximately $12,000 to

$15,000 each; and during the fiscal year ended June 30, 1954, there were 603 homes sold in approximately the same price range.

The sales of these homes were made to various home purchasers by Park Forest Homes, Inc., under contracts for warranty deeds. In 1953, 43 contracts for warranty deeds were assigned and sold to Home Federal Savings and Loan Association of Chicago, hereinafter referred to as Home Federal. Home Federal retained $2,225 in respect to each contract it purchased from Park Forest Homes, Inc., in a restricted and pledged account hereinafter referred to as a "dealers' reserve account." Under this dealers' reserve account, Park Forest Homes, Inc., was not entitled to the amounts in the account if the contract purchaser was in default. If not in default, Home Federal would release from the dealers' reserve account to Park Forest Homes, Inc., the sum of $100 for every $150 in principal collected from the contract purchaser, but not to exceed the reserve balance in each case. At June 30, 1953, the amounts in the dealers' reserve account in Home Federal totaled $95,675, which sum was excluded by Park Forest Homes, Inc., from its gross income reported for the fiscal year ended June 30, 1953.

In respect to the sales of homes made to various home purchasers by Park Forest Homes, Inc., in the year ended June 30, 1954, under contracts for warranty deeds, there were assigned and sold 248 contracts for warranty deeds to Home Federal under the aforementioned terms. In addition, 43 contracts were assigned and sold to Oak Park Federal Savings and Loan Association of Oak Park, Illinois, hereafter referred to as Oak Park Federal. Oak Park Federal retained $1,320 in respect to each contract it purchased from Park Forest Homes, Inc., in a dealers' reserve account. Park Forest Homes, Inc., was not entitled to the amounts in the dealers' reserve account if the contract purchaser defaulted. If not in default, Oak Park Federal would release to Park Forest Homes, Inc., the sum of $25 for every $100 in principal collected from the contract purchasers, but not to exceed the reserve balance in each case. For the fiscal year ended June 30, 1954, the net amount added to the dealers' reserve accounts in both Home Federal and Oak Park Federal totaled $385,211.35, which sum was excluded from gross income reported by petitioner for that year.

The Commissioner for the fiscal year ended June 30, 1953, included in the taxable income of petitioner the sum of $95,675, being the amount in the dealers' reserve account as of June 30, 1953. The Commissioner for the fiscal year ended June 30, 1954, included in the taxable income of petitioner the sum of $385,211.36, being the difference between the dealers' reserve account balances as of June 30, 1954, of $480,886.36 and as of June 30, 1953, of $95,675.

The inclusion of the foregoing amounts resulted from a formal audit of petitioner's income tax returns for the years 1946 through June 30, 1954. Petitioner was orally informed by the revenue agent in July 1958 that the dealer reserve income was an issue. On September 17, 1958, the office of the director of internal revenue at Chicago mailed the following letter to petitioner which it received on September 20, 1958:

[Front]

Form L–19 (5–57)

(Seal)  U.S. Treasury Department
Internal Revenue Service
*District Director*
*Chicago 2, Illinois*

*Sep 17 1958*

AMERICAN COMMUNITY BUILDERS, INC.
c/o ALTSCHULER, MELVOIN & GLASSER
*110 South Dearborn Street*
*Chicago 3, Illinois*

Attention: Mr. C. Melvoin

You previously indicated that you did not agree to the adjustment(s) marked (*) listed on the reverse hereof which were proposed during a recent examination of your income tax liability.

IF YOU DESIRE AN INFORMAL CONFERENCE with a representative of this office for the purpose of securing an impartial review of these adjustments, please so advise within the next TEN DAYS by telephoning or writing to the person whose name and address are shown below. Upon receipt of your request, a mutually convenient time and place for the conference will be arranged. You may be accompanied by any person or persons, acting solely in the capacity of witnesses, who may have knowledge of facts or can furnish information in support of the contentions on which you rely.

In the event that you desire to appear with a representative, or if you do not wish to attend the conference personally, your representative must be enrolled to practice before the Treasury Department, and a Power of Attorney in his name must be filed in duplicate with an additional conformed copy for each taxable year in excess of one, together with a contingent fee statement.

IF YOU DO NOT REQUEST AN INFORMAL CONFERENCE within the time stated above, a report of the examination will be forwarded to you after which the prescribed procedure toward asserting the correct income tax liability will be followed. Should you decide to accept the proposed adjustments at this time, it will be appreciated if you so notify this office at the address shown below.

*       *       *       *       *       *       *

[Back]

Form L–19  U.S. Treasury Department–Internal Revenue Service
(5–57)

STATEMENT OF EXAMINING OFFICER'S PRO-
POSED ADJUSTMENTS

| | *Year Ended (or period)* | |
| --- | --- | --- |
| | *6–30–53* | *6–30–54* |
| ADJUSTED GROSS NET INCOME BEFORE NET OPERATING LOSS DEDUCTION SHOWN ON RETURN__ | $1,049,353.64 | $(430,007.36) |
| NET ADJUSTMENTS AS COMPUTED BELOW__ | 581,145.85 | 629,481.45 |

| | | |
|---|---|---|
| PROPOSED NET INCOME BEFORE NOLD_____ | $1,630,499.49 | $199,474.09 |
| PROPOSED INCREASE (DECREASE) AND EXPLANA- TION _____ | _____ | _____ |
| (a) Gross profit on sale of houses, reported as unrealized must be included in income where the contracts received by the vendor (taxpayer) have a fair market value. Such fair market value is considered to be 100%. | | |
| Regulations 39.44–4 (a) & (c). Section 41. I.R.C. 1939 Revenue Ruling 55–292, 1955–1 CB– 331 _____ | 198,452.07 | 445,597.84 |
| (b) Cost of houses sold is adjusted for the cost of water mains and latterals transferred to Park Forest Water Co_____ | 229,202.75 | 81,671.75 |
| (c) Depreciation is adjusted with respect to item (b), above_____ | (10,942.41) | 32.69 |
| (d) Real estate and Personal property taxes are adjusted for over and under accruals_____ | (86,199.36) | 43,835.77 |
| (e) The documentary stamp expense pertaining to stock transfers is a capital item and must be disallowed_____ | 632.80 | _____ |
| (f) The amount paid to Mr. Goodman and pertaining to the financing of F.H.A. loans is not deductible. Amortization is allowed__ | _____ | 58,343.40 |
| (g) Legal fee not deductible was the subject of a prior Informal Conference_____ | 250,000.00 | _____ |

On October 8, 1959, the Commissioner sent to petitioner a statutory notice of deficiency determining deficiencies in income tax of $374,903.24 for the fiscal year ended June 30, 1953, and of $97,086.71 for the fiscal year ended June 30, 1954. These deficiencies were in part based upon the Commissioner's inclusion in petitioner's taxable income of the amounts in the dealers' reserve accounts heretofore mentioned.

OPINION.

The controversy in the instant case pertains to the recently enacted Pub. L. 86–459 (May 13, 1960) more commonly known as the Dealer Reserve Income Adjustment Act of 1960. The requisites for qualification under the Act are enumerated in the following section:

SECTION 2. PERSONS TO WHOM THIS ACT APPLIES.

This Act shall apply to any person who, for his most recent taxable year ending on or before June 22, 1959—

(1) computed, or was required to compute, taxable income under an accrual method of accounting,

(2) treated any dealer reserve income, which should have been taken into account (under the accrual method of accounting) for such taxable year, as accruable for a subsequent taxable year, and

(3) before September 1, 1960, makes an election under section 3(a) or 4(a) of this Act.

The facts clearly indicate that petitioner comes within the ambit of "Persons To Whom This Act Applies."

Petitioner, under section 3, elected to have section 481 apply. Section 3 of the Act provides:

SECTION 3. ELECTION TO HAVE SECTION 481 APPLY.

(a) General Rule.—If—

(1) for the year of the change (determined under subsection (b)), the treatment of dealer reserve income by any person to whom this Act applies is changed to a method proper under the accrual method of accounting (whether or not such person initiated the change),

(2) such person makes an election under this subsection, and

(3) such person does not make the election provided by section 4(a),

then, for purposes of section 481 of the Internal Revenue Code of 1954, the change described in paragraph (1) shall be treated as a change in method of accounting not initiated by the taxpayer.

(b) Year of Change, Etc.—In applying section 481 of the Internal Revenue Code of 1954 for purposes of this section, the "year of the change" in the case of any person is—

(1) except as provided in paragraph (2), the first taxable year ending after June 22, 1959, or

(2) the earliest taxable year (whether the Internal Revenue Code of 1954 or the Internal Revenue Code of 1939 applies to such year) for which—

(A) on or before June 22, 1959—

(i) the Secretary of the Treasury or his delegate *issued a notice of deficiency*, or a *written notice of a proposed deficiency*, with respect to dealer reserve income, or

\*       \*       \*       \*       \*       \*       \*

(B) the assessment of any deficiency, or the refund or credit of any overpayment, whichever is applicable, was not, on June 21, 1959, prevented by the operation of any law or rule of law.

For purposes of this section, section 481 of such Code shall be treated as applying to any year of the change to which the Internal Revenue Code of 1939 applies. [Emphasis supplied.]

The crux of the dispute here is to be found in section 3(b), the "Year of Change," and is more particularly focused upon the interpretation of the phrase, "a written notice of a proposed deficiency," embodied in 3(b)(2)(A)(i).

On September 20, 1958, petitioner received a "10-day letter" as shown in the Findings of Fact, which had as one of the "Examining Officer's Proposed Adjustments" an adjustment to petitioner's dealer reserve income for the years 1953 and 1954. The Commissioner determined that this 10-day letter is a "written notice of a proposed deficiency" within the concept of the statute and, accordingly, that the "year of change" for purposes of section 481 was 1953, the petitioner's last "open year." Petitioner in objecting to this determination contends that the "10-day letter" was not a "written notice of a proposed deficiency," and that the only "notice of deficiency" or "written notice of a proposed deficiency" it received was the statutory notice of deficiency mailed to it on October 8, 1959. Accordingly, petitioner con-

tends that its "year of change" is its first year ending after June 22, 1959, namely, its fiscal year ended June 30, 1959.

Section 1.9002–2(b), Income Tax Regs.,[1] promulgated under the authority of section 5(f) [2] merely reiterates the explanation enunciated in the committee reports with respect to the statutory language at issue and so in itself is not of much help with our problem. Accordingly, we turn to the committee reports for whatever light they may throw on the proper interpretation of the terminology of the Act.

The legislative purpose is recited in the "General Statement" of the bill. It states:

The usual dealers' reserves arise from the sale of customers' installment paper to finance companies. (Another type of arrangement is provided for by your committee's amendments. See item (5) in the explanation of the amendments.) The way in which these reserves arise can be illustrated by an example of an automobile dealer, a business where dealer reserves have been used quite widely. Initially the dealer sells a car to a customer, accepting his note together with a cash down payment and trade-in as the selling price of the car. The customer then executes a note, usually on forms supplied by a finance company, and the dealer then sells the installment paper to the finance company in return for a partial payment to him by the finance company of the face amount of the paper. The finance company, however, reserves, or holds back, a portion of the balance due the dealer and in addition may set aside a portion of the finance charge on the paper otherwise due the dealer. Losses incurred by the finance company may be charged against these dealers' reserves, either the portion sometimes referred to as the "holdback" or the amount attributable to a division of the finance charge between the finance company and the dealer. In addition, if a customer pays off his note ahead of time there also may be a charge against these reserves, in this case usually against the finance charge portion.

In transactions of this general type the question is whether this reserve is income to the dealer in the year of the sale of the article and the sale of the installment paper to the finance company or, on the other hand, is income to the dealer only when he actually receives the reserved amount in cash from the finance company.

The Supreme Court on June 22 [1959] of this year in *Commissioner* v. *Hansen*, *Commissioner* v. *Glover*, and *Baird* v. *Commissioner*, held in these cases that the

---

[1] (b) *Year of change*. Where an election has been made under section 3(a) of the Act to have section 481 of the Code apply, then for purposes of applying section 481 of the Code the year of change shall be determined in accordance with the provisions of section 3(b) of the Act. Section 3(b) provides that the year of change is the earlier of (1) the first taxable year ending after June 22, 1959, or (2) the earliest taxable year for which, on or before June 22, 1959,

(1) There was issued a notice of deficiency or written notice of a proposed deficiency attributable to the erroneous treatment of dealer reserve income, or

(ii) The taxpayer filed a claim for refund or credit with respect to the treatment of such income, and in respect of which the assessment of any deficiency, or the refund or credit of any overpayment, was not prevented on June 21, 1959, by the operation of any law or rule of law. *The written notice of proposed deficiency includes a 15- or 30-day letter issued under established procedure or other similar written notification.* [Emphasis supplied.]

[2] (f) REGULATIONS.—The Secretary of the Treasury or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this Act, including regulations relating to—

(1) the application of the provisions of this Act in the case of partnerships, and

(2) the manner in which the elections provided by this Act are to be made.

specific reserves involved were properly reportable as income when "the dealers acquired a fixed right to receive the amounts so retained by the finance companies."

Your committee agrees that dealer reserve income should be reported on a proper accrual accounting basis. Nevertheless, it believes that a hardship would be created by requiring all dealers to make a transition to this method of reporting this income in 1 year. It believes that in view of the fact that the Courts of Appeals in the Third Circuit, the Fourth Circuit, the Fifth Circuit, the Eighth Circuit, and the Ninth Circuit have held that the reserves were not accruable as income until the year of withdrawal of the reserve, taxpayers had sufficient reasons for not reporting this income in the earlier year. This appears to be true even though in the sixth and seventh circuits and in numerous Tax Court cases the holdings were to the contrary. In view of the large number of circuit court decisions in favor of the taxpayers and the fact that from 1944 to 1958 without exception the circuit court holdings were in favor of the taxpayers, your committee believes it would be unfortunate to require the dealers involved to make substantial payments of tax for these back years all in the current year. This is believed to represent a particularly difficult hardship in the case of the many small dealers in personal property who have held what for them represent substantial sums tied up in these reserves. Information submitted to your committee also suggests the same is true of dealers and developers of low-cost homes.

In view of the hardship in these cases your committee's bill provides two alternative forms of treatment.

In general terms, the first alternative permits taxpayers to treat the correction of the method of reporting this reserve income as a required change in method of accounting, usually for the year 1959, which is the year of the Supreme Court decision (*although in earlier years if the taxpayers were on notice of deficiency on this issue and in similar cases*). The effect of treating this reserve income as a required change in method of accounting is to ignore adjustments to income to the extent of dealer reserves set up in years prior to 1954 (if they are closed years). Your committee believes that it is proper to treat this correction of dealer reserve income as a required change in method of accounting since from a practical standpoint the Court decision has this effect, whether the taxpayer proceeds to comply with the decision on his own part *or the change is made only after an examination of his return by a revenue agent.* [Emphasis supplied.]

For taxpayers who elect this alternative to treat the correction of the reporting of dealer reserve income as a change in method of accounting, the additional income to be reported will be the difference between the opening dealer reserve balance in the year of change (usually 1959) and the opening dealer reserve balance in 1954 (or earlier year if still open). Then if this difference increases taxable income by more than $3,000 in the current year, the tax attributable to it can be determined by spreading the income evenly over the year *of change and 2 preceding taxable years, where this results in a lower tax* than the inclusion of the entire amount in the income of the year of change. This is the treatment now provided under section 481 in the case of a required change in method of accounting. Also, as provided under section 481, the effect of the adjustment can be determined by recomputing the income under the correct method for as many prior years as the taxpayer can establish his taxable income.

S. Rept. No. 1045, 86th Cong., 2d Sess., 1960–1 C.B. 826, 827.

Moving then to the "Technical Explanation" and that part devoted to "Section 3, Election to have section 481 apply," the committee says:

Section 3(a) of the bill provides that if, for the year of the change, the treatment of dealer reserve income is changed (whether or not the change is initiated by the taxpayer) and the person described in section 2 makes the election provided for in section 3(a) and does not make the election under section 4(a), then, for purposes of applying section 481 of the Internal Revenue Code of 1954, the change shall be treated as not being initiated by the taxpayer.

Section 481 of the Internal Revenue Code of 1954 requires that if there is a change in the taxpayer's method of accounting, then, generally, all adjustments necessary as a result of the change to prevent omissions or duplication of income or deductions are required to be taken into account for the taxable year of the change. Under section 481(a), however, if the change was not initiated by the taxpayer, then any adjustments attributable to taxable years to which the 1954 Code does not apply are disregarded. Section 481(b) (1) and (2) of the code provides limitations on the tax for the year of the change if the net amount of the adjustments attributable to 1954 Code years which must be taken into account for the year of the change increases taxable income for that year by more than $3,000. The necessary adjustments required by section 481 are to be taken into account for the taxable year of the change.

Subsection (b) of section 3 describes the year of the change in the case of a person exercising the election provided for in section 3(a). Under the House bill that year is the first taxable year ending after June 22, 1959 (irrespective of whether the taxpayer changed to the proper method in such year), or the earliest prior taxable year in respect of which assessment of any deficiency or refund or credit of any overpayment is not prevented by any law or rule of law if, for such prior taxable year, the taxpayer either (1) filed a claim for refund or credit with respect to the treatment of dealer reserve income, or (2) *was notified in writing, either by statutory notice of deficiency, or otherwise, of a proposed deficiency attributable to the erroneous treatment of such income.* In applying subsection (b) the House bill did not specify which date was to be used in determining whether assessment of a deficiency or refund or credit was prevented. Your committee has changed paragraph (2) to specify that in making the determination the question turns on whether or not assessment of any deficiency or refund or credit of any overpayment was prevented on June 21, 1959, the date immediately preceding the date of the Supreme Court's decision dealing with dealer reserve income. *For this purpose, the notice in writing includes a 15- or 30-day letter issued under established procedure, or other similar written notification of a proposed deficiency.*

Thus, if for the calendar year ending December 31, 1959, the taxpayer changed to the proper method of accounting for dealer reserve income, but for the taxable year 1956 a statutory notice of deficiency relating to the treatment of such income was issued and that year was the earliest taxable year in respect of which assessment of a deficiency was not prevented on June 21, 1959, then, if the election under subsection (a) is timely exercised, 1956 shall be treated as the year of change. In such a case, the net amount of any adjustments found necessary as a result of the change which is attributable to years subject to the 1954 Code shall be taken into account for the year of the change. The net amount of the adjustments attributable to pre-1954 years is to be disregarded. If, in that case, *no notice of a proposed deficiency of any type had been issued,* and if no claim for refund had been filed, then, for the purposes of applying section 481, the taxable year 1959 shall be treated as the year of the change, and any net increase in the amount of the reserve credited to his account at the beginning of that year over the opening balance of the reserve credited to his account at the beginning of the first taxable year subject to the 1954 Code shall be included in income for the year of the change.

Subsection (b) also provides that, for purposes of applying section 3(a) of the bill, section 481 of the 1954 Code shall be treated as also applying to the earliest year subject to the 1939 Code in respect of which assessment of any deficiency or refund or credit of any overpayment was not prevented on June 21, 1959, by the operation of any law or rule of law in the same manner it would have applied had it been enacted as part of the Internal Revenue Code of 1939. Thus, if a 30-day letter specifying adjustments relative to dealer reserve income was properly issued in respect of the taxable year 1951 and the resulting deficiency in tax may be asserted for that year, then, if the taxpayer timely exercises the election provided for in subsection (a), 1951 shall be considered to be the taxable year of the change and section 481 shall be applied to that year and be given effect for that year in the same manner as it would have applied had it been enacted as a part of the 1939 Code and the change to the proper method of accounting had not been initiated by the taxpayer. Since, in such a case, the bill makes section 481 applicable only to 1951, any adjustments resulting from the change attributable to pre-1951 years shall be disregarded. The income of each taxable year succeeding the year of change in respect of which the assessment of any deficiency or refund or credit of any overpayment is not prevented, by the operation of any law or rule of law will, of course, be recomputed under the proper method of accounting.
[Emphasis supplied.]

S. Rept. No. 1045, 86th Cong., 2d Sess., 1960–1 C.B. 826, 830.

It is explicit from these reports that the statute was enacted as a transitional measure to relieve taxpayers from possible adverse tax consequences that might otherwise have emanated from the Supreme Court's decision in *Commissioner* v. *Hansen*, 360 U.S. 446 (1959). The "General Statement" in referring to the "first alternative," section 3, states specifically that its purpose is to permit the taxpayer "to treat the correction of the method of reporting this reserve income as a required change in method of accounting, usually for the year 1959, which is the year of the Supreme Court decision * * * [unless he had been] on notice for an earlier year." This "notice," states the "Technical Explanation," is "notice in writing [and] includes a 15- or 30-day letter issued under established procedure, or other similar written notification of a proposed deficiency."

The question posed is whether the "10-day letter" received by petitioner comes within the purview of the appended phrase, "other similar written notification of a proposed deficiency."

In order to view the 15- and 30-day letters,[3] which are set out in the

---

[3] Form L–16 (REV. 5–59)

| | U.S. Treasury Department | |
|---|---|---|
| (SEAL) | Internal Revenue Service | |
| | District Director | |
| | Chicago 90, Illinois | |
| | U.S. Court House | |
| | Dearborn & Adams Streets | In reply refer to |
| | P.O. Box 795 | D :AUD :OA : |
| | Dearborn 2–4500, Ext. | Gr. #———— |
| | | Taxable year(s) ended |

The enclosed report, which has been prepared after careful consideration of available information, discloses certain adjustments or conclusions resulting from an examination of your return(s) for the year(s) above indicated.

IF YOU ACCEPT THE FINDINGS, please sign and return promptly the enclosed agree-

margin, and the 10-day letter in their proper perspective, we think it necessary to review briefly their roles in the procedural design of the

ment form. If additional tax is shown to be due, you may either remit such amount together with interest at 6% per year from the due date of the return to the date of payment, or you may await receipt of a notice of the tax and interest due before making payment.

IF YOU DO NOT ACCEPT THE FINDINGS, you should submit any information which you believe will support your contentions, or, if you prefer, you may call in person at this office to present evidence or information pertinent to the case on any day during business hours except Saturday, Sunday, or a legal holiday. We will be pleased to answer any questions regarding the adjustments, and will give careful attention to all information which you submit. If you wish, you may request an informal conference for the purpose of securing a review of these adjustments.

Your case will be held in abeyance for a period of FIFTEEN DAYS from the date of this letter pending receipt of the signed agreement form or advice that you disagree with the proposed adjustments. IMPORTANT: It is essential that communications relative to this letter be sent to the above address. Please cite the reference shown at the top right of this letter.

Very truly yours,

District Director
By: * * *
Acting Chief, Office Audit Branch

Enclosures:
Report of Examination
Agreement Form (Form 870)

(SEAL)                    U.S. Treasury Department
Internal Revenue Service
District Director
Chicago 90, Illinois
Post Office Box 1193
Dearborn 2–4500, Ext. 263

In reply refer to

The attached report, which has been carefully reviewed by this office, discloses certain adjustments or conclusions resulting from the examination of the return(s) for the taxable year(s) indicated therein.

If you accept the findings, please execute the enclosed agreement form and return it to this office promptly. If you do not accept the findings, you may, WITHIN 30 DAYS from the date of this letter, file a protest in accordance with the enclosed instructions. Any protest filed will be given careful consideration and, if requested, a conference will be granted by the Appellate Division of the Regional Commissioner's office.

Submission of the agreement form will expedite assessment of the proposed deficiency and stop the running of interest thereon 30 days after receipt of the form, or on the date of assessment or on the date of payment, whichever is the earliest. If desired, payment of the proposed deficiency may be made without awaiting assessment by making remittance therefor payable to the INTERNAL REVENUE SERVICE, at the address shown above, enclosing this letter or a copy thereof. The remittance should include interest on the additional tax (exclusive of penalties, if any) computed at 6% per annum from the due date of the return to the date of the payment.

This is not a statutory notice of deficiency. If however, upon the expiration of the 30-day period you have not submitted the agreement form, or a written protest, or you have not advised that the deficiency has been paid or will be paid upon notice and demand, a statutory notice will then be sent you as provided by law.

Prompt execution and return of the enclosed receipt form indicating your position with respect to the findings disclosed by the report will be greatly appreciated.

IMPORTANT: It is essential that communications transmitting protests or agreements relative to this letter be addressed to the District Director of Internal Revenue, Audit Division, at the above address. Please cite the reference shown at the top right of this letter.

Very truly yours,
Enclosures:
Report of Examination
Agreement Form (Form 870)                    *District Director*
Receipt Form (Form 1291)
Instructions
FORM L-5
(10-56)

Internal Revenue Service. The "10-day letter" is issued following a field audit as part of the informal conference procedure. The General Procedural Rules, 26 C.F.R. sec. 601.105 (c), state:

(c) *Informal conference procedure—*

(1) *General.* If the taxpayer does not agree with the findings of the examining agent, the taxpayer is advised in writing that he may present his objections to such findings at an informal conference in the Audit Division of the district director's office. The taxpayer is usually granted 10 days from the date of the written notice in which to request an informal conference on the proposed changes. * * *

(2) *Scope of informal conference procedure.* The informal conference procedure described in this paragraph is applicable in the determination of any liability in respect of income, * * * taxes. * * *

(3) *Rules governing informal conferences.* The objective of the informal conference procedure is to give taxpayers greater opportunity to reach an early agreement with respect to disputed items arising from examinations made by internal revenue agents. This procedure affords a means by which such issues may be resolved prior to the preparation of the agent's final report and without the necessity of the taxpayer filing a formal protest. * * * In the event that an agreement with the taxpayer is reached at the informal conference, the taxpayer will be requested to execute Form 870 or other appropriate agreement form. Any deficiency in tax or additional tax proposed will then be assessed, or any overpayment will be credited or refunded.

The "15-day letter" is also an invitation to an informal conference "for the purpose of securing a review of [the examining agent's] adjustments," and is issued subsequent to an office audit under the signature of the chief of the Office Audit Branch. The "30-day letter" is sent if no settlement has been effected with the agent or by the informal conference. It advises the taxpayer that a protest may be filed which is a necessary condition precedent to Appellate Division jurisdiction. The General Procedural Rules, 26 C.F.R. sec. 601.103 (c) (1), provide:

(c) *Disputed liability—*(1) *General.* If the informal conference does not result in agreement on the adjustments proposed to be made, the taxpayer is given an opportunity to submit a protest in writing, stating under oath the facts on which he relies and the grounds for his contention that the adjustments are not proper. * * *

The General Procedural Rules, 26 C.F.R. sec. 601.105 (d) (2), are as follows:

(2) *Protests.* (i) If the taxpayer chooses to file a protest against the proposed determination set forth in the "30-day letter", his protest should be filed in the district director's office and, following review of the protest, the case will be referred to the Appellate Division of the region if that Division has jurisdiction. The taxpayer will also be accorded a conference in the Appellate Division if he requests it. * * *

A comparison of the letters with a view to their functional utility in the procedural plan seems to categorize the 10- and 15-day letters as methods of informing the taxpayer of his right to an informal con-

ference with respect to the adjustments proposed to be made. On the tier above the 10- and 15-day letters in the procedural design is the preliminary, or 30-day letter, which advises the taxpayer of his right to file a protest on appeal to the Appellate Division. In contrast to this classification, petitioner would distinguish the various letters on an entirely different basis. It argues that the characteristic which controls here is that both the 15- and 30-day letters set out a computation of corrected tax liability either resulting in a deficiency or over-assessment, whereas, on the other hand, the 10-day letter merely contains a "Statement of the Examining Officer's Proposed Adjustments" and does not include a computation of corrected tax liability. Petitioner claims further that it is not even possible to compute the correct tax from the figures given in the 10-day letter issued here, because the "proposed net income" was "before NOLD" (net operating loss deduction). Petitioner, relying on the Definition of a Deficiency section, sec. 6211 of the 1954 Code,[4] says that a deficiency whether determined or proposed must be a definite and final amount, and concludes that any tax even if computed on the basis of the qualified net income given, would only be a tentative tax subject to further adjustment.

There is no statutory definition of a "proposed deficiency" and we think the distinction drawn by petitioner transgresses the legislative intent as gleaned from the committee reports. From a consideration of the "General Statement" in conjunction with the "Technical Explanation," we think it is implicit that Congress in referring to "other similar written notification of a proposed deficiency" after designating the 15- and 30-day letters meant also to encompass a writing issued under an established procedure, which notified the taxpayer of his erroneous treatment of dealer reserve income with corresponding adjustments, which would result in a proposed deficiency in the taxpayer's income tax as reported.[5]

If a definitely ascertained deficiency amount had been the objective, Congress could have dispensed with any notification other than the statutory notice of deficiency and thus in every case insured that a taxpayer be notified of a definite, fixed, and final amount. We are

[4] SEC. 6211. (a) IN GENERAL.—For purposes of this title in the case of income, estate, and gift taxes, imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A or B exceeds the excess of—
(1) the sum of
   (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
   (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—
(2) the amount of rebates, as defined in subsection (b)(2), made.

[5] It is interesting to note that 2 Mertens, Law of Federal Income Taxation, sec. 12.67(c) (1961 Supp.) comments that "the notice in writing includes a 10-day or 30-day letter issued under established procedure or other similar written notification of a proposed deficiency." A footnote to this statement states that "In the Reports the reference is made to a 15-day letter."

cognizant of the fact that the 10-day letter did not contain such a definite, fixed, and final amount or include the net operating loss deduction. And we also realize that anyone who did not know the amount of the net operating loss deduction could not properly compute the correct tax. Petitioner, however, did know the amount of the net operating loss deduction and therefore was aware that the proposed income adjustments with respect to the dealer reserve account did propose a deficiency in income tax for both taxable years. Insofar as petitioner is concerned, the 10-day letter was notification of a proposed deficiency resulting from its erroneous method of accounting for dealer reserve income.

The importance of the notification aspect is re-echoed throughout the committee reports by such phrases as "although in earlier years if the taxpayers *were on notice of deficiency on this issue and in similar cases*," "*if he has not been on notice* for an earlier year," "was *notified in writing*, either by statutory notice of deficiency, *or otherwise*," "*no notice of a proposed deficiency of any type* had been issued," and "a 30-day letter *specifying adjustments relative to dealer reserve income*." (Emphasis supplied.) And we think written notification is the keystone of the legislative scheme with respect to the "year of the change." As we view it, Congress in drafting the criteria to ascertain the "year of the change" for applying section 481, chose the *Hansen* decision as the line of demarcation. "Those persons to whom [the] Act applies" and who prior to June 22, 1959, the date of the *Hansen* decision, had been improperly accounting for dealer reserve income but had not been "notified in writing" that the method they were employing was incorrect were permitted to utilize as their "year of the change" "the first taxable year ending after June 22, 1959," because as the committee report states,

it is proper to treat this correction of dealer reserve income as a required change in method of accounting [for the first taxable year after June 22, 1959] since from a practical standpoint the Court decision has this effect, whether the taxpayer proceeds to comply with the decision on his own part or the change is made only after an examination of his return by a revenue agent.

Conversely, a taxpayer who qualifies under section 2 of the Act but who was "notified in writing" of certain adjustments to his income "attributable to the erroneous treatment of [dealer reserve] income" which proposed a deficiency prior to the Supreme Court's decision in *Hansen* cannot avail himself of "the first taxable year ending after June 22, 1959" as his "year of change." As to this taxpayer the procedural machinery to compel a change in his method of accounting was not initiated as a consequence of the Court's ruling in *Hansen*, but was already in motion at the time of the *Hansen* decision as a result of "an examination of his return by a revenue agent." The taxpayer

in such a circumstance must revert to his earliest "open year" as his "year of the change."

We are convinced that the 10-day letter issued to petitioner was the type notification envisioned by Congress when referring to "other similar written notification of a proposed deficiency" in the committee reports. Consistent with our view that Congress was concerned with the notification aspects, the letter informed petitioner that as a result of a "recent examination of [its] income tax liability" its method of accounting for dealer reserve income was subject to adjustment and specified the amount of adjustments. It was issued as part of an established procedure which culminates in the issuance of the statutory notice of deficiency and was received on September 20, 1958, more than 9 months prior to the decision in *Hansen*.

Other issues raised by the pleadings have been settled by stipulation.

Reviewed by the Court.

*Decision will be entered under Rule 50.*