*Decisions will be entered under Rule 50.*

FRANK HANDFIELD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 40251. Filed January 17, 1955.

*F. W. Oberkirch, C. P. A.*, for the petitioner.
*James J. Quinn, Esq.*, for the respondent.

---

OPINION.

ARUNDELL, *Judge:* The principal question in this proceeding is whether the petitioner, a nonresident Canadian, was engaged in business in the United States during the year in controversy. The determination of this question depends upon the nature of the arrangement which the petitioner had for selling in this country an item which he manufactured in Canada.

The petitioner manufactures a novelty item called Folkards which is a kind of postal card. He had a contract with the American News Company by which the latter distributed his cards to newsstands in the United States where they were sold to the public. The petitioner contends that the American News Company purchased the cards from him for resale. He further contends that the sale occurred in Canada when the cards were placed in transportation and at that time he surrendered all his right, title, and interest in the cards to the News Company.

The respondent contends that the arrangement between the petitioner and the News Company provided for an agency relationship, and that the News Company was petitioner's exclusive distributor in the United States.

The nature of the contract between petitioner and the News Company is to be determined from the intention of the parties. *Ross* v. *H. Michaelyan, Inc.*, (C. A. 2, 1932) 57 F. 2d 674. We have an extremely meager record on which to make that determination. At the trial, the parties were cautioned that the record was quite am-

biguous for a decision on a question of some importance. Nevertheless, we have been left with only the bare agreement between the petitioner and the News Company and a few stipulated facts from which to determine the nature of the arrangement.

It will be observed that the agreement between the petitioner and the News Company nowhere says that the News Company *buys* or will buy the petitioner's cards or that the company is or will be obligated for any definite number of cards or in any definite amount. The contract uses the word "sale" twice. In each instance it is clear that the word refers to transactions with the public, not between the petitioner and the News Company. Thus, the contract states, "If * * * the *sale* in any city should be unsatisfactory, we will pick up stock from dealers, and return it to you, * * *." (Emphasis supplied.) And, also, that the News Company "reserves the right to withdraw them [the cards] from *sale* without notice" when copyright or patent infringement is threatened. (Emphasis supplied.) The contract speaks of its purpose as confirmation of "arrangements recently discussed *for the exclusive distribution through our Company*" in the United States where it is "mutually agreed to put these [cards] out." (Emphasis supplied.) The contract specifies the rate at which the News Company will be billed for the cards, the rate at which the cards will be billed to the "trade," and the retail price at which the cards will be sold. But, payments were to be made "on the basis of actual check-ups of dealers' stocks sixty days *after distribution*, and every thirty days thereafter." (Emphasis supplied.) The contract stated that all cards were "fully returnable" and that transportation on shipments to and from the United States was to be paid by the petitioner and that he would allow credit on all unsold cards, regardless of condition.

The contract gave exclusive rights to the News Company "to *distribute* Folkards in the United States" and, as noted above, the News Company could "pick up stock from dealers and return it" after it "mutually agreed to discontinue the *distribution*" in any city. (Emphasis supplied.)

The foregoing language raises some doubt whether the News Company actually sells the cards to the public or whether it acts as a distributor to newsdealers who sell to the public. We do not have enough information in the record to make any findings concerning the relationship between the News Company and the dealers. In our view of the case, it is immaterial precisely what that relationship may be because, as will appear below, the important relationship is that between the petitioner and the News Company.

Petitioner visited the United States occasionally to check on his arrangement with the News Company and during the period in issue, he was in the country for a total of 24 days on four different

visits. However, he had an employee in the United States whom he paid to visit the various outlets of the News Company checking to insure that the cards were being properly displayed and retailed.

From all the provisions of the contract and all the information on the operations of the petitioner in relation to it that are in this record, we think that the arrangement between the petitioner and the News Company was one in which the News Company was his agent in the United States. We think that the cards were shipped on consignment to the News Company for sale to the public. All the aspects of the agreement point to this interpretation of the contract and none are inconsistent with this interpretation.

The features of the contract which are particularly persuasive in bringing us to the interpretation we have placed on it are: The News company does not obligate itself to buy any definite amount of merchandise from petitioner and it is obligated only to account for the merchandise which has been sold; all merchandise unsold may be returned; the petitioner will pay the transportation on the cards to and from Canada and give full credit for all cards unsold regardless of their condition; the agreement controls the retail price; and it gives the News Company the right to discontinue merchandising the cards when they move slowly or when they infringe copyright or patent provisions. All these, taken together, we think indicate that the arrangement was an agency relationship in the form of a contract of consignment. *Ludvigh* v. *American Woolen Co.*, 231 U. S. 522 (1928) ; *Edgewood Shoe Factories, Etc.* v. *Stewart*, (C. A. 5, 1939) 107 F. 2d 123; *McCallum* v. *Bray-Robinson Clothing Co.*, (C. A. 6, 1928) 24 F. 2d 35.

Of such an arrangement, one court has said (*In re Taylor*, (E. D., Mich., 1931) 46 F. 2d 326, 328) :

A contract of consignment * * * imposes no obligation upon the consignor to sell or upon the consignee to buy any property, and it effects no sale or transfer of title, conditional or absolute, from consignor to consignee. It merely creates a bailment between the consignor as bailor and the consignee as bailee, of property of the bailor, with authority in the bailee as his agent to sell such property to third persons and with the duty to account to him for the proceeds of any such sale. On such a sale the title passes, not from the consignor to the consignee as in a contract of conditional sale, but from the consignor as owner, through the consignee as his agent, to the purchaser. In the absence of such a sale the consignee may return the property to the consignor without liability for the purchase price thereof.

Petitioner's counsel argues that the language of the stipulation requires a finding that the cards were "sold" to the American News Company under the contract. We think there is no merit in this contention. In presenting the stipulation, counsel for the respondent insisted that the cards were not sold to the News Company, although at the same time petitioner's counsel was contending otherwise. We can-

not accept any inept wording in the stipulation as meaning that the respondent was conceding the very point in issue. The nature of the transaction between the petitioner and the News Company is to be determined from the full agreement, as we have done.

Article III of the Tax Convention [1] between the United States and Canada subjects the industrial and commercial profits of a Canadian enterprise derived through a "permanent establishment" within the United States to the income taxes of this country. The Protocol implementing the Convention defines an "enterprise" as "every form of undertaking, whether carried on by an individual, partnership, corporation or any other entity," and a "permanent establishment" as follows, in part:

> When an enterprise of one of the contracting States carries on business in the other contracting State through an employee or agent established there, who has general authority to contract for his employer or principal or has a stock of merchandise from which he regularly fills orders which he receives, such enterprise shall be deemed to have a permanent establishment in the latter State. [Paragraph 3 (f).]

The News Company, under its contract with petitioner, was an "agent" in the United States with a "stock of merchandise" from which it regularly filled orders for the public. Therefore, within the meaning of the above Protocol, we think the petitioner had a "permanent establishment" in the United States under his arrangement with the News Company. It follows, then, that he was engaged in business within the United States in the year in issue and the income from his operations in this country is subject to taxation under section 211 (b) of the Internal Revenue Code of 1939.[2]

Petitioner raises a subsidiary issue in view of our holding that he was engaged in business in the United States. He deducted from the

---

[1] Article III.

If an enterprise of one of the contracting States has a permanent establishment in the other State, there shall be attributed to such permanent establishment the net industrial and commercial profit which it might be expected to derive if it were an independent enterprise engaged in the same or similar activities under the same or similar conditions. Such net profit will, in principle, be determined on the basis of the separate accounts pertaining to such establishment.

In the determination of the net industrial and commercial profits of the permanent establishment there shall be allowed as deductions all expenses, wherever incurred, reasonably allocable to the permanent establishment, including executive and general administrative expenses so allocable.

[2] SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

(b) UNITED STATES BUSINESS OR OFFICE.—A nonresident alien individual engaged in trade or business in the United States or having an office or place of business therein shall be taxable without regard to the provisions of subsection (a). As used in this section, section 119, section 143, section 144, and section 231, the phrase "engaged in trade or business within the United States" includes the performance of personal services within the United States at any time within the taxable year, but does not include the performance of personal services for a nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States, by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of ninety days during the taxable year and whose compensation for such services does not exceed in the aggregate $3,000. * * *

gross receipts of his operation $2,800 for salary which he paid to himself, and also $171.67 for interest on money which he loaned to his enterprise in the United States. The petitioner claims these deductions under section 213 (a) of the Internal Revenue Code of 1939. That provision allows section 23 business expense deductions to nonresident aliens to the extent that such expenses are connected with income from sources within the United States. If we correctly comprehend petitioner's theory, it is that he is entitled to charge against the income received in the United States compensation for his services to the business and interest on money loaned to the business.

The petitioner operated his enterprise as a sole proprietorship. We know of no authority, and petitioner cites us to none, that would allow petitioner to take a deduction for salary to himself and interest on money borrowed from himself as a "business expense" of a sole proprietorship. There is no justification for the deductions taken by petitioner for these two items and consequently the respondent's determinations disallowing them are approved.

*Decision will be entered under Rule 50.*