GUNDERSON BROS. ENGINEERING CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4360-62. Filed May 21, 1964.

*Frank E. Nash* and *Maurice O. Georges*, for the petitioner.
*John D. Picco* and *Richard H. M. Hickok*, for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in petitioner's income tax for the fiscal years ending May 31, 1958,[1] and May 31, 1959, in the respective amounts of $17,152.07 and $33,322.21. The parties have agreed to certain adjustments with respect to the deficiencies.

The remaining issues for decision are (1) whether the petitioner, an accrual basis taxpayer, must include as income in the year of sale, finance charges attributable to sales on a deferred payment basis where the petitioner retains the cusotomers' obligations and where under State law and by terms of the contract the purchaser has the right to receive a refund of a portion of the finance charge by early payment, and (2) whether the petitioner is entitled to the benefits of the Dealer Reserve Income Adjustment Act of 1960.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is an Oregon corporation organized on June 1, 1942, with its principal office located in Portland, Oreg. Petitioner maintained its books on the accrual method of accounting, using a fiscal year ending May 31. It filed Federal corporate income tax returns for the fiscal years here involved with the district director of internal revenue at Portland, Oreg.

During the period here involved and for many years prior thereto, petitioner was engaged in the business of manufacturing and selling industrial products and engaged in the business of selling trucks, trailers, and similar equipment for use in the logging industry. Starting in 1945, customers who were unable or unwilling to pay cash for motor trucks and trailers purchased the same on a deferred payment basis. Many trucks and trailers were so sold during the period involved herein. Purchasers were required to pay a finance charge in addition to the cash selling price of the equipment. The practice of making a finance charge in connection with deferred payment sales is customary in the truck and trailer sales business.

A sales price was first negotiated with the customer. After agree-

---

[1] The deficiency for this year arises from the disallowance of a net operating loss carryback from fiscal year ended May 31, 1959.

ment was reached as to the sales price, the finance charge was then discussed. Petitioner did not compute finance charges at the same rate for each customer but based the amount of such charge on a credit report prepared for each particular customer. Among the factors considered in determining the rate of finance charges were the customer's net worth, his reputation for maintaining equipment, any rate which he may have been able to establish with a bank or other financial institution, and the general condition of the lumber market.

Prior to the petitioner's establishing its own finance division in November 1958, most of the deferred payment sales made by the petitioner were financed by selling the obligations of the customers to a financial institution on a full recourse basis. Although not expressly provided for in the sales contracts prior to January 1, 1958, it was the consistent practice of petitioner and the financial institutions to which petitioner sold deferred payment obligations of its customers to refund a portion of the finance charge in the event of early payment.

Where petitioner sold its customers' obligations to financial institutions, the latter would credit petitioner's reserve account with the finance charge, less the institution's service charge. Petitioner would defer its portion of the finance charge due it from the financial institution and accrue it in equal monthly installments.

Starting in November 1958, when petitioner established its own finance division, the practice of selling the customers' installment obligations to financial institutions was discontinued.

In 1957 the Oregon Legislative Assembly enacted Oregon Laws, chapter 625, which is now Ore. Rev. Stat. ch. 83, relating to the installment sale and financing of motor vehicles, with an effective date of January 1, 1958. Ore. Rev. Stat. ch. 83 requires a reduction in the finance charge in the event of early payment. Ore. Rev. Stat. ch. 83 provides that the following items be expressly set out in any retail installment contract for motor vehicles: (1) Cash sales price; (2) downpayment; (3) difference between items 1 and 2; (4) insurance; (5) filing fees; (6) principal balance (items 3, 4 and 5); (7) finance charge; (8) time balance (items 6 and 7); and (9) time-sales price. Petitioner would accrue all of item 1 (cash sales price) and all of items 4 and 5 (insurance and filing fees) in the year in which the sale took place and would defer all of item 7 (finance charge) in a manner to be discussed subsequently. In addition, the Oregon statute required the following notice to appear on every retail installment contract involving the sale of a motor vehicle:

### NOTICE TO THE BUYER

Do not sign this contract before you read it or if it contains any blank space, except that if delivery of the vehicle is to be made to you after this contract is signed, the serial number or other identifying information and the due date of the first instalment may be filled in at the time of delivery.

You are entitled to a copy of this contract.

You have the right to pay off in advance the full amount due and to obtain a partial refund of the finance charge.

The Oregon statute further provided the maximum limitation on the amount of finance charges. The amount varied from $8 per year per $100 of the principal balance to $12 per $100. No other charges were permitted by the statute for the extension of credit.

The retail installment contract used by petitioner complied fully with the requirements as to form and contents as set forth in Ore. Rev. Stat. ch. 83. The refund (reduction) required to be made in the event of early payment was computed by petitioner in accordance with Ore. Rev. Stat. ch. 83 for those early payments made after January 1, 1958.

The typical contract provided that the purchaser agreed to pay the contract "time balance" which included the cash sales price of the motor vehicle (less the downpayment), insurance, filing fees, and finance charge. Each retail installment contract was accompanied by a non-interest-bearing note given as a part of the same transactions. Each deferred-payment buyer signed both the contract and the note. The note was made out for the full amount of the time balance, which included the finance charge. The note, a copy of which is set forth in the margin,[2] provided for installment payments which divided the time balance into the number of payments called for in the contract.

As a general rule, in all instances where petitioner retained the customers' obligations, it would accrue the finance charges as installment payments when collected. Some of the contracts allowed the customer to "skip" one or more payments without increasing the finance charge.

---

[2] AUTOMOBILE DEALER INSTALMENT NOTE

(Individual or Corporate Discount Form)

$_____ _____, Oregon _____, 19__

FOR VALUE RECEIVED, each of the undersigned promises to pay in lawful money of the United States to _____ at _____, in the City of _____, Oregon, the sum of _____ DOLLARS, in _____ equal successive monthly instalments of $_____ each payable on the same day of each month, commencing _____, 19__.

_____

If any instalment shall not be paid when due and such default shall continue for ten days or longer, the undersigned agrees to pay a delinquency charge at the maximum rate permitted by law. Upon any default, the whole sum then owing shall become, at the option of the holder of this note, immediately due and payable. In case suit or action is brought to collect this note or any portion thereof, the undersigned promises to pay such additional sum as the Court may adjudge reasonable as attorney's fees therein.

Address _____     _____
Address _____     _____

For use only with Motor Vehicle Purchase Price Chattel Mortgage

This note differed from those used prior to January 1, 1958, in at least two respects:

(1) The note used prior to January 1, 1958, was made payable to "the order of _____."

(2) The note used prior to January 1, 1958, contained no statement indicating that it was to be used only with the Motor Vehicle Purchase Price Chattel Mortgage.

In those cases in which payments were so skipped, the petitioner accrued the portion of the finance charge allocable to it, even though the payment was not then due. Where payments were missed by the customer in violation of the terms of the contract, the portion of the finance charge allocable to the installment period was not accrued until the payment was actually made. The finance charge accrued each month was a portion computed on the sum-of-the-digits method.

The fair market value of the promissory notes at no time exceeded the "principal balance" as that term is used in the retail installment contract.

The petitioner did not elect to report income by use of the installment method as provided by section 453 of the Internal Revenue Code of 1954.

In those cases where the customers' obligations were retained by petitioner at the time of sale, the entire amount of the finance charges was credited to a deferred income account on the books of the petitioner. At the close of each fiscal period, debits measuring the accruals during the period were made to that account and the debits were reported as earned income on the petitioner's tax return for that period.

As of May 31, 1959, the balance in petitioner's deferred income account was $108,482.20, of which $61,525.18 [3] represented unearned finance fees attributable to credit extended to purchasers of merchandise sold on a deferred payment basis, the customers' obligations being retained by petitioner.

Respondent determined that petitioner's practice of accruing less than the entire finance charge at the time of sale was inconsistent with the accrual method of accounting. Accordingly, respondent included the amount of $108,416.55 in the gross income of the petitioner for the fiscal year ended May 31, 1959.[4] This amount has been reduced by agreement of the parties [5] to $61,525.18, representing the unearned finance fees attributable to customers' obligations retained by petitioner.

Any net operating loss sustained by petitioner in its fiscal year ended May 31, 1959, would result in a carryback to petitioner's fiscal year ended May 31, 1958, and any overpayment resulting therefrom would be refundable to petitioner.

---

[3] The remaining portion of the $108,482.20 consisted of $46,891.37 which represented deferred finance charges on the obligations purchased by petitioner from the financial institutions and $65.65 which represented the unearned finance fees on an obligation sold by petitioner to a financial institution and not repurchased.

[4] This sum represented the balance of the unearned finance fees account on the books of petitioner on May 31, 1959, less $65.65 in unreported finance fees relating to the one contract petitioner sold and did not buy back.

[5] The parties stipulated that $46,891.37, representing the deferred finance charges on the obligations purchased by petitioner from the financial institutions, is properly deferrable and is not part of petitioner's gross income for fiscal year ended May 31, 1959.

The unearned finance fees attributable to customers' obligations retained by petitioner constituted income as each installment became due.

In the case of deferred payment sales where the petitioner sold the customers' obligations to a financial institution, the latter would:

1. Deduct from the time balance a service fee for its own service.

2. Credit petitioner's reserve account with petitioner's portion of the finance charge.

3. Credit petitioner's reserve account with a percentage of the time balance.

4. Pay to petitioner, in cash, the difference between the time balance and items 1, 2, and 3.

Petitioner deferred item 2 and accrued it in even installments. Prior to November 18, 1958, petitioner had deferred and had not accrued $3,228.92 of the item 2 type finance charge attributable to deferred payment sales made prior to that date.

On November 18, 1958, after establishing its own finance division, petitioner purchased all its discounted customers' obligations outstanding in the hands of the financial institutions, except for one account. The purchase price consisted of cash and the cancellation of credits in petitioner's reserve accounts. As of May 31, 1959, the unearned finance charges attributable to the customers' obligations purchased from the financial institutions were $46,891.37, which amount included the $3,228.92 referred to in the preceding paragraph, and which amount the parties have agreed was properly deferrable and not includable in petitioner's income as of May 31, 1959. As of May 31, 1959, petitioner did not have any dealer reserve income.

A "10-day" letter, dated December 31, 1957, was addressed to petitioner by an internal revenue agent wherein, among other things, an adjustment was proposed increasing petitioner's income by the inclusion of the credit to the reserve account made by the financial institution. The proposed adjustments contained in the 10-day letter did not propose a deficiency for the fiscal year ended May 31, 1956, one of the years covered by the letter, but had the effect of only reducing petitioner's operating loss for said year. Petitioner agreed to the proposed adjustments which affected fiscal years ended May 31, 1955, May 31, 1956, and May 31, 1957.

As of June 22, 1959, petitioner's earliest taxable year for which the assessment of any deficiency or the refund or credit of any overpayment was not prevented by the operation of law or any rule of law, was the fiscal year ended May 31, 1956.

On August 22, 1960, the petitioner made an election pursuant to section 3 of the Dealer Reserve Income Adjustment Act of 1960.

The Dealer Reserve Income Adjustment Act of 1960 does not apply to petitioner.

OPINION

The parties are agreed that petitioner is to be treated as an accrual basis taxpayer for the purpose of determining whether the finance charges credited under a new car retail installment contract at the time of sale should be considered income to the petitioner in the year of sale. The petitioner contends that under the facts in this case the finance charges on customers' obligations retained by petitioner are to be included in taxable income only as earned over the life of the customers' obligations, while the respondent takes the position that an accrual basis taxpayer must report the finance charges as taxable income in the year of sale. We agree with petitioner.

The statutory provisions determining the question involved are section 446 [6] and section 451 [7] of the Internal Revenue Code of 1954. Under the accrual method, it is when the right to receive income becomes fixed and absolute that the duty to report it arises.[8] Until the right to receive an item of income becomes fixed, the taxpayer is under no duty to report it as income. Any other method might result in the paying of a tax on income which the taxpayer may never have the right to receive. *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934).

The question here requires a review of the manner in which the item involved (finance charge) arose and a determination of the period in which it became accruable as income.

After arriving at a sales price of the vehicle, the petitioner and prospective purchaser would arrive at the finance charge to be added to the sales price. The finance charge would vary depending upon, among other things, the financial condition of the purchaser and his reputation for maintaining the equipment. After taking into account the cash downpayment made by the purchaser, the latter would execute an installment contract and non-interest-bearing note for the remaining balance. Both the contract and the note would require the purchaser to pay off the balance in equal monthly installments.

---

[6] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

\* \* \* \* \* \* \*

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

\* \* \* \* \* \* \*

(2) an accrual method;

[7] SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION.

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

[8] Sec. 1.446–1(c)(1)(ii), Income Tax Regs., provides:

Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. \* \* \*

The petitioner would accrue, in the year of sale, the cash sales price. The finance charge would be accrued by petitioner as each installment became due through the use of the sum-of-the-digits method. At the time of the sale, the entire finance charge would be credited to a deferred income account. At the close of each fiscal year, petitioner would debit this account for the total accruals during the year. The balance of the account represented the finance charges which had not been earned and accrued as of the end of the fiscal year. As of May 31, 1959, the amount which represented the unearned finance fees attributable to customers' obligations retained by petitioner totaled $61,525.18.

Prior to January 1, 1958, it was the consistent practice of petitioner and the financial institutions to whom petitioner sold some of its customers' obligations to refund a portion of the finance charge in the event of early payment. As of January 1, 1958, a refund of a portion of the finance charge was made mandatory by Oregon statute [9] in the event of early payment. The Oregon statute [10] went so far as to require the retail installment contract to include a notice informing the purchaser that he had the right to pay the balance off early and receive a refund of part of the finance charge. As we have found, the contract forms used by petitioner complied fully with the Oregon statute.

The method of accounting used here by the petitioner, with one possible exception,[11] clearly reflects its income. The finance charge at the time of sale had not been earned. It would be earned over the life of the contract. *Texas Trailercoach, Inc.*, 27 T.C. 575 (1956), reversed on dealer reserve issue 251 F. 2d 395 (C.A. 5, 1958). The event necessary to fix the right to receive a definite and exact amount did not occur until the passage of time. Sec. 1.446–1(c) (1) (ii), Income Tax Regs. See also *Smith Motors, Inc.* v. *United States*, an unreported case (D. Vt. 1961, 8 A.F.T.R. 2d 5336, 61–2 U.S.T.C. par.

---

[9] Ore. Rev. Stat. sec. 83.620. Voluntary prepayment by buyer; refund. Notwithstanding the provisions of a retail instalment contract to the contrary, the buyer may pay in full at any time before maturity the obligation contained in the retail instalment contract. Upon such premature payment, the buyer shall receive a refund credit. The amount of the refund credit shall not be less than that proportion of the finance charge after first deducting from such finance charge an acquisition cost of not more than $15, as the sum of the periodic time balances after the month in which prepayment is made, bears to the sum of all the periodic time balances under the schedule of instalments in the original contract. Where the amount of the credit for premature payment is less than $1, no refund need be made. This section does not prohibit the holder of a retail instalment contract from collecting any charge, cost or fee under ORS 83.590.

[10] Ore. Rev. Stat. sec. 83.520.

[11] Where the purchaser failed to make a payment and the contract did not allow for a skip, petitioner would not accrue that portion of the finance charge until paid. As to whether this is proper is questionable to say the least. Once the payment was due, petitioner had a fixed right to that portion of the finance charge and the amount should have been accruable. However, since we do not approve the respondent's determination regarding this issue and since respondent does not raise this particular question as an alternative, we must decide the entire issue for petitioner.

9627). The amount to be received by petitioner in the form of finance charges was not fixed and reasonably ascertainable at the time the notes were acquired. The purchaser had a statutory right embodied in the installment contract to pay off the balance at an early date and thereby be entitled to a proportionate reduction of the finance charge. As each monthly installment became due, the petitioner was entitled to a portion of the finance charge. At that time its right became fixed and reasonably ascertainable. It was not until such time that all the events had occurred which fixed the right to receive the finance charge. Petitioner picked up in income a portion of the finance charge at the time each installment became due by use of the sum-of-the-digits method. Petitioner's use of this method of accruing a portion of the finance charge as contrasted to the use of any other method which would accrue only a portion of the finance charge (equal monthly installment) is not contested by respondent. Accordingly, we do not pass upon the propriety of the method used by petitioner.[12]

The only case which we could find which dealt with a situation similar to the one present here was *Smith Motors, Inc.* v. *United States, supra.* In the *Smith* case the taxpayer was an automobile dealer in Vermont. In those instances where automobiles were sold on a deferred payment plan, the price included a carrying charge which was paid monthly. The contract provided for a reduction of the carrying charge in the event of early payment. The total carrying charge was credited to a deferred income account and only picked up in annual income as each installment became due. The taxpayer used the accrual method of accounting. The Government sought to include in current income the balance of the deferred income account. The District Court, in accepting the taxpayer's method of reporting the carrying charges, said:

> The method used here by the taxpayer clearly reflected his income. If he had reported as income the total possible carrying charges at the time of the sale, his taxable income would be distorted. The reason for this is that if a purchaser were to pay the entire amount due for the vehicle purchased in a shorter time than called for by the contract, the taxpayer would be reporting as income carrying charges not only that never would be received but that never accrued. Therefore, under the method adhered to by the Commissioner, the taxpayer would be required to report as income earnings that never accrued as the carrying charge in each particular month would never accrue or become

---

[12] Ore. Rev. Stat. sec. 83.620 set forth in fn. 9, *supra,* provides for a refund of the finance charges based upon a modified sum-of-the-digits method. That is, the earlier the prepayment, the larger the refund. Petitioner's method of accruing the finance charge was consistent with the statute. This can best be shown by an example:

Assuming a finance charge of $1,015 on a 36-month installment period, if the note were paid off at the end of the 7th month, the statute would require a refund of $653. Under petitioner's method of accruing the finance charge, an amount of $662.98 would not have been accrued at the end of the 7th month. The monthly accrual under the statute would be $45, while under petitioner's method it would be $45.72 at the end of the 7th month.

earned until the completion of that pay period. By reporting the entire amount of carrying charges at the time of the sale, the taxpayer's income would be erroneous. *Bressner Radio, Inc.* v. *Commissioner of Internal Revenue, * * * 267 F. 2d 520.

It is only where the right to receive a definite and exact amount becomes fixed should it be included in gross income. Here, if a purchaser pays his obligation in a shorter period than contracted for, the taxpayer would never have the right to receive that part of the carrying charges which is paid early. Therefore that part would never accrue.

We believe this reasoning is applicable to the instant case. Cf. *Chicago Acceptance Co.*, 12 B.T.A. 150 (1928).[13]

Respondent maintains, correctly so, that an accrual basis taxpayer must account for income in the year all the events have occurred which fix the right to receive such income. Respondent then goes on to state, and correctly so, that the right to receive exists when (1) all events have occurred which establish the liability of the purchaser, and (2) when the amount the purchaser is to pay can be ascertained with reasonable certainty. However, respondent then states that in the instant case the aforestated two prerequisites were met at the time when a purchaser in the instant case signed the installment contract and promissory note. This statement or position fails to give proper recognition to the Oregon statute and to the terms of the installment contract itself. The event which makes the purchaser liable for the finance charge is not the signing of the contract but rather it is the passage of time without his making any early payment.[14] We can see no difference

---

[13] See *Columbia State Savings Bank*, 15 B.T.A. 219 (1929), affd. 41 F. 2d 923 (C.A. 7, 1930), wherein the case of *Chicago Acceptance Co.*, 12 B.T.A. 150 (1928), is distinguished. In the *Chicago* case, where an accrual basis taxpayer purchased notes at a discount and where the payor of the note received a reduction of the charge in the event of early payment, we held that only so much of the discount as was earned within the taxable year constituted income. In the *Columbia* case, where the facts were similar except that no reduction was given to the payor in case of early payment, we held that the income was accrued in the year the loans were made. The *Chicago* case was distinguished on the sole ground that in the event of early payment a reduction of the charge was given the payor, so that it could not be said that the liability of the payor became definitely fixed and determined until the passage of time.

[14] It would seem that this is not the case of a condition subsequent, but rather the case of a condition precedent. See *Etheridge & Banneman, Inc.*, 40 T.C. 461 (1963), wherein we determined to follow the opinion of the Court of Appeals for the Sixth Circuit in *Guarantee Title and Trust Co.* v. *Commissioner*, 313 F. 2d 225 (C.A. 6, 1963), reversing a Memorandum Opinion of this Court. Where the right to receive income is contingent upon the happening of a future event—passage of time without early payment—the right cannot be said to arise or exist in the taxable year to be accounted for as income under the accrual method of accounting. *Guarantee Title and Trust Co.* v. *Commissioner, supra.*

Respondent makes mention of the fact that it is only a voluntary early payment that allows the customer a reduction in the finance charge; that in case of default, the petitioner would be entitled to the entire finance charge; and that the instances of voluntary early payment are relatively few in number and involve a relatively small sum as compared to the gross finance charges.

Respondent reaches his conclusion that only voluntary early payment will give a reduction in the finance charge by relying upon the heading of Ore. Rev. Stat. sec. 83.620 which reads "Voluntary prepayment by buyer; refund." However, the words of the actual section do not limit the prepayment to a voluntary one. Furthermore, the heading of a section does not constitute any part of the law. Ore. Rev. Stat. sec. 174.540 provides:

between the instant case and a case where an accrual basis taxpayer seeks in 1956 to take an annual interest deduction on a 10-year note where the terms of the note provide that payment of the entire obligation by 1957 will waive and cancel *all* interest payments. Where the payment of interest is based upon a contingency such as this, no interest deduction can accrue prior to 1957. *1220 Realty Company* v. *Commissioner*, 322 F. 2d 495 (C.A. 6, 1963), affirming on this issue a Memorandum Opinion of this Court.

Furthermore, we feel the finance charge under the circumstances of this case is in the nature of interest. Cf. *Western Credit Co.*, 38 T.C. 979 (1962), affirmed per curiam 325 F. 2d 1022 (C.A. 9, 1963). Interest has been defined as "the compensation allowed by law or fixed by the parties for use, or forebearance, or detention of money." *Fall River Electric Light Co.*, 23 B.T.A. 168 (1931). See also *Deputy* v. *duPont*, 308 U.S. 488 (1940). Clearly, in the instant case the finance charge represents an amount allowed by law and fixed by the parties for the forebearance of money. It was the only charge, under the Oregon statutes,[15] allowed to be imposed upon the purchaser for the extension of credit. The amount of the charge was closely related to the maximum interest allowed to be charged under the Oregon statutes.[16] The refund of a portion of the charge upon early payment is an additional factor indicating that the charge is in reality interest. The Internal Revenue Code of 1954 [17] recognizes that separately stated finance charges can be deducted as interest. Accordingly, the finance charge, being similar in all respects to interest, accrues ratably. *Lake Charles Naval Stores*, 25 B.T.A. 173 (1932). See also *J. B. Jemison*, 18 B.T.A. 399 (1929).

The respondent's reliance on the so-called dealer reserve cases appears to be misplaced. In those cases, the automobile dealer would sell the customers' obligations to a financial institution, usually at a discount. The financial institution would pay to the dealer a certain portion of the price and credit a reserve account for the balance. Usually the dealer cannot withdraw from the reserve account until it reaches a certain level. The question arose as to the time the reserve

Parts of printed statute editions not to be a part of the law. Title heads, chapter heads, division heads, section and subsection heads or titles, and explanatory notes and cross references, in the statute laws described in subsection (1) of ORS 174.510 and in parts of Oregon Revised Statutes, do not constitute any part of the law.

Moreover, we feel respondent's interpretation of the statute is incorrect because it seems that where the State legislature did not want to give a purchaser a refund of the finance charge in case of early payment caused by his being in default, it so stated with precise language in the statute. Ore. Rev. L., 1963, sec. 8, ch. 489, provides:

Notwithstanding the provisions of any retail instalment contract to the contrary, and if the rights of the purchaser have not been terminated or forfeited under the terms of the contract, any buyer may prepay in full the unpaid time balance thereof at any time before its final due date and, if he does so, and if the contract is not in default under any term or condition of the contract more than two months, he shall receive a refund credit of the unearned portion of the service charge for such prepayment.

[15] Ore. Rev. Stat. sec. 83.570.

[16] Compare Ore. Rev. Stat. sec. 83.560 with Ore. Rev. Stat. sec. 82.010.

[17] Sec. 163 (b) (1). See also sec. 1.163–2, Income Tax Regs.

account was taxable to the dealer. The Supreme Court decided the question in *Commissioner* v. *Hansen*, 360 U.S. 446 (1959), wherein it held that the dealer must accrue the amounts in the reserve account at the time they were entered on the books of the finance companies as liabilities to the dealers.

The difference between the accounting for finance charges where the customers' obligations were sold to financial institutions and where they were retained by the dealer was pointed out in *General Gas Corporation* v. *Commissioner*, 293 F. 2d 35 (C.A. 5, 1961), affirming 33 T.C. 303 (1959), certiorari denied 369 U.S. 816 (1962). In that case the taxpayer, using the accrual method of accounting, originally held on to its customers' obligations until maturity. When a better financial position was necessary, it started to discount some of its paper. The arrangement with the financial institutions called for the establishment of a reserve, with the finance charges being part of the reserve account. The question before the Court of Appeals concerned the treatment of the dealer reserve which was controlled by the *Hansen* case. However, the Court of Appeals, in answering one of the taxpayer's arguments, had this to say regarding the customers' obligations retained by the taxpayer:

> We do not consider any more persuasive the argument by General Gas that since as to customer notes retained by it General Gas was permitted to defer the portion representing finance charges * * * over the life of the note, the same procedure should be allowed as to finance charges reserved in notes sold to Bancredit [a financial institution]. * * * It is not disputed that General Gas treated these finance charges under the declining balance method.
>
> The simple answer * * * is that things were not the same. There was a vital distinction. As to those notes retained by General Gas it was an unlimited exposure of the corporation's direct credit to their full amount. It had no such exposure on those sold to the three financing companies. * * * Where, for notes held by General Gas, it got the benefit of the installment finance charges only when and as paid, under the financing arrangement at least two things occurred. * * * These things were the direct consequence of a sale, * * * The note was sold. * * * *It is the sale itself which makes . a difference.* [Emphasis added.]

The cases of *Morgan* v. *Commissioner*, 277 F. 2d 152 (C.A. 9, 1960), affirming per curiam 29 T.C. 63 (1957) ; *Shapiro* v. *Commissioner*, 295 F. 2d 306 (C.A. 9, 1961), affirming a Memorandum Opinion of this Court, certiorari denied 369 U.S. 829 (1962) ; *Wiley* v. *Commissioner*, 266 F. 2d 48 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 361 U.S. 831 (1959) ; and *Schaeffer* v. *Commissioner*, 258 F. 2d 861 (C.A. 6, 1958), affirming a Memorandum Opinion of this Court, certiorari denied 360 U.S. 917 (1959), relied upon by respondent, are distinguishable from the instant case for the same reasons stated above.

Respondent next refers us to the prepaid income cases recently decided by the Supreme Court. In *Automobile Club* [*of Michigan*] v.

*Commissioner*, 353 U.S. 180 (1957), and *American Automobile Assn.*
v. *United States*, 367 U.S. 687 (1961), the Supreme Court was con-
fronted with accrual basis taxpayers who, after receiving in advance
dues from their members, sought to defer part of the dues until the
next taxable year. In *Schlude* v. *Commissioner*, 372 U.S. 128 (1963),[18]
the Supreme Court, in upholding the Commissioner's determination
that the cash receipts, negotiable notes received, and contract install-
ments due and payable during the year were taxable currently, found
the issue to be squarely controlled by the *American Automobile Assn.*
case. The Court once again relied upon the fact, as it did in its two
earlier decisions, that "the advance payment related to services which
were to be performed only upon customers' demands without relation
to fixed dates in the future." The Court, quoting from *Spring City
Co.* v. *Commissioner*, *supra*, to the effect that "it is the *right* to receive
and not the actual receipt that determines the inclusion of the amount
in gross income" of an accrual basis taxpayer, and citing *Commis-
sioner* v. *Hansen*, *supra*, found that the right to receive the contract
installments "had become fixed at least at the time they were due and
payable."

In all three Supreme Court cases referred to above, payment was
received in advance by accrual basis taxpayers. In *Automobile Club
[of Michigan]* and *American Automobile Assn.* payment was in the
form of cash. In *Schlude* payment was in the form of cash and nego-
tiable promissory notes. It was this fact of payment that required the
amounts received to be included in income in the year of receipt even
for accrual basis taxpayers.

As was pointed out by the Supreme Court in the *Schlude* case, the
Commissioner—

retreated somewhat and does not now claim the includibility in gross income
of future payments which were not evidenced by a note and which were neither
due by the terms of the contract nor matured by performance of the related
services.[6]

6 "Upon reconsideration, however, we concede the error of accruing future payments
which are neither due as a matter of contract, nor matured by performance of the related
services. Indeed, the Studio's right to collect the installment on its due date depends on
its continuing ability and willingness to perform. Until that time, its right to receive
payment has not fully ripened." Brief for the United States, p. 67.

18 In *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), the taxpayer, who operated a dance
studio and who kept his books on an accrual basis, offered two types of contract. One
plan required a cash downpayment and the balance in installments; the other required
only a portion of the downpayment to be paid in cash, with the remaining part of the
downpayment to be paid in installments. The balance of the contract was to be paid as
provided for in a negotiable promissory note executed at the time of the contract. The
two contracts provided that the student was not to be relieved of his obligation to pay
the tuition, no refunds would be made, and the contracts were noncancelable. Each con-
tract called for a specific number of lessons but without any specific dates being set aside
for each lesson. The taxpayer included in current income at the end of each taxable year
that portion of the contract price which equaled the designated rate per hour multiplied
by the actual number of hours taught during the year. The remaining portion of the
contract price was carried in a "deferred income" account to the next year.

In the instant case the petitioner received a cash downpayment and a promissory note for the balance. The note included the principal balance plus finance charges. The cash downpayment and the principal balance were reported as income in the year of sale.

The fact that in the *Schlude* case the receipt of a negotiable note was considered as payment to the extent of its fair market value and as such was required to be included in income in the year received is, in fact, consistent with the results herein reached. The promissory notes executed by petitioner's customers were not negotiable notes. A copy of the note used is set forth in our findings of fact. A negotiable promissory note, as defined by the Uniform Negotiable Instruments Law, is as follows:

A negotiable promissory note within the meaning of this act is an unconditional promise in writing made by one person to another signed by the maker engaging to pay on demand, or at a fixed or determinable future time, a sum certain in money *to order or to bearer.* * * * [Emphasis added.][19]

An instrument made payable to a named individual is not payable to order or to bearer but to a specified person alone and is not negotiable. *Security Finance Co.* v. *Comini*, 119 Or. 460, 249 Pac. 1054 (1926) ; 11 Am. Jur. 2d 147.

A reading of the note used in this case will indicate that no words of negotiability are present. The notes are made out only to a named individual—petitioner. The promissory note herein used was a nonnegotiable note. A holding that the receipt of a nonnegotiable note by an accrual basis taxpayer (for interest where the right to receive the interest has not matured) is payment and must be reported as income in the year of receipt is not required by the *Schlude* case. The *Schlude* case held that the receipt of a negotiable note was, to the extent of its fair market value, the equivalent of cash and must be reported as income when received even by an accrual basis taxpayer. A nonnegotiable note is not the equivalent of cash. Cf. *Mainard E. Crosby*, 14 B.T.A. 980 (1929). The reason for drawing a distinction between the two types of notes is clear. A negotiable promissory note is freely and easily negotiable, mainly because any defenses available between the original parties thereto are not available if the note finds its way into the possession of a holder in due course. This rule does not apply in the case of a nonnegotiable instrument present in the instant case. Cf. Ore. Rev. Stat. sec. 83.650. Accordingly, petitioner, not having received payment, need not report as income the finance charge until earned.[20] Furthermore, even if the note herein involved were con-

---

[19] U. Neg. Inst. Law sec. 184. The Negotiable Instruments Law was part of the Oregon laws during the years herein involved as Ore. Rev. Stat. sec. 71.001 et seq.

[20] Although we have found that the note in question is nonnegotiable because it lacks words of "negotiability," we could have reached the same result for another reason. The note on its face states "For use only with Motor Vehicle Purchase Price Chattel Mortgage." This reference to an extrinsic document on the face of the note could only be for

sidered to be negotiable, our holding is consistent with the *Schlude* case. An accrual basis taxpayer does not report an item as income until the right to receive it becomes fixed. However, where an accrual basis taxpayer receives payment, he must report it as income when received regardless of when his right to the income will become fixed. This in effect places an accrual basis taxpayer on the same footing as a cash basis taxpayer. The question then arises as to what constitutes payment. See *Bedell* v. *Commissioner*, 30 F. 2d 622 (C.A. 2, 1929), affirming 9 B.T.A. 270 (1928). *Schlude* says the receipt of a negotiable note by an accrual basis taxpayer is considered payment to the extent of its fair market value. We have found as a fact in this case that the fair market value of the notes never exceeded the "principal balance," which is basically comprised of the cash sales price, less the downpayment, which amount petitioner did accrue as income at the time of the sale. Accordingly, our holding on this issue is consistent with the holding reached in the *Schlude* case.

For the same reasons the cases of *Streight Radio & Television, Inc.*, 33 T.C. 127 (1959), affd. 280 F. 2d 883 (C.A. 7, 1960), certiorari denied 366 U.S. 965 (1961), cited by respondent, and *Automobile Club of New York, Inc.*, v. *Commissioner*, 304 F. 2d 781 (C.A. 2, 1962), affirming 32 T.C. 906 (1959),[21] are distinguishable.

We are of the opinion that in view of the applicable sections and regulations of the Internal Revenue Code of 1954 and the pertinent language contained in the Oregon statutes referred to previously, all events have not occurred at the time of sale which fix petitioner's right to the finance charges. Accordingly, payment not having been made in advance, petitioner's accruing a portion of the finance charge as each installment became due by use of the sum-of-the-digits method and deferring the remaining portion of the finance charge until the note became due, clearly reflected its income and was proper. *Smith Motors, Inc.*, v. *United States, supra*.

The only remaining issue concerns the applicability of the Dealer Reserve Income Adjustment Act of 1960, 74 Stat. 124, to petitioner. The facts regarding this issue have been stipulated by the parties and are not in dispute.

the purpose of incorporating the very terms of the chattel mortgage into the note. A note and mortgage executed at the same time are to be construed together. *Hull* v. *Angus*, 60 Or. 95, 118 Pac. 284 (1911). In the instant case the chattel mortgage being part of the retail installment contract, the terms of the contract and mortgage would become part of the note and render it nonnegotiable. *Hull* v. *Angus, supra*. Furthermore, the right of the purchaser to obtain a refund of a portion of the finance charge would make the promise to pay conditional and the amount uncertain, thereby rendering the note nonnegotiable.

[21] A majority of the Second Circuit still feels that its decision in *Bressner Radio, Inc.*, v. *Commissioner*, 267 F. 520 (C.A. 2, 1959), reversing 28 T.C. 378 (1957), which allowed a retail television dealer employing the accrual method of accounting to defer prepaid revenue on 12-month servicing contracts over the 12-month period, and which opinion was rejected by the Supreme Court in *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961), has life.

Prior to November 18, 1958, petitioner sold most of its customers' obligations to financial institutions. The financial institutions would pay to petitioner a portion of the time balance while retaining, in a reserve account, the balance of the sales price which was composed of the finance charges. Petitioner would not accrue the amount credited to the reserve account but, instead, would defer the amount, picking it up in income as each installment became due. As of November 18, 1958, petitioner had deferred, but not accrued, $3,228.92, representing finance charges attributable to deferred sales made during the current year in which the customers' obligations were sold.

On November 18, 1958, petitioner decided to operate its own finance division and purchase all its customers' obligations originally sold to financial institutions.[22] This was accomplished by the payment of cash, plus the cancellation of the credits in the petitioner's reserve accounts maintained by the financial institutions. On May 31, 1959, the unearned finance charges attributable to customers' obligations purchased from the financial institutions were $46,891.37, which the parties agreed were properly deferrable and not accruable in this fiscal year.

On December 31, 1957, a 10-day letter was addressed to petitioner proposing certain adjustments for the fiscal years ended May 31, 1955, May 31, 1956, and May 31, 1957. One of the adjustments concerned the inclusion in current income of the balance in the dealer reserve account. The effect of the proposed adjustments was to reduce petitioner's operating losses for fiscal years ended May 31, 1956, and May 31, 1957. Petitioner accepted the adjustments as proposed. On August 22, 1960, petitioner made a timely election under section 3 of the Dealer Reserve Income Adjustment Act of 1960. Thereafter a claim for refund was filed for the fiscal year ended May 31, 1958, accompanied by an amended return wherein petitioner recomputed its income under section 481, treating fiscal year ended May 31, 1956, as the "year of the change."

Petitioner maintains that it is a "person" to whom the Act applies and that since it made a timely election under section 3(a), it should obtain the benefits of the Act which would effect its tax liability for fiscal year ended May 31, 1958, which year is now before us.

Respondent, on the other hand, argues that petitioner is not a person to whom the Act applies as defined in section 2 and, therefore, is not entitled to the benefits of its provisions. We agree with respondent.

The Dealer Reserve Income Adjustment Act was passed to lighten the burden of the tax consequences of the Supreme Court's decision in

[22] One account, owing by Everett Tiffin, held by the Douglas County State Bank, Roseburg, Oreg., was not purchased. There is no explanation in the record why this account was not purchased.

*Commissioner* v. *Hansen, supra.* S. Rept. No. 1045, 86th Cong., 2d Sess., 1960–1 C.B. 826.

To qualify under the Act, petitioner must meet the conditions of the following section:

SEC. 2. PERSONS TO WHOM THIS ACT APPLIES.

This Act shall apply to any person who, for his most recent taxable year ending on or before June 22, 1959—

(1) computed, or was required to compute, taxable income under an accrual method of accounting,

(2) treated any dealer reserve income, which should have been taken into account (under the accrual method of accounting) for such taxable year, as accruable for a subsequent taxable year, and

(3) before September 1, 1960, makes an election under section 3(a) or 4(a) of this Act.

Petitioner meets the conditions of (1) and (3) of the aforequoted section. However, we do not feel petitioner qualifies under (2) of this section. Petitioner's most recent taxable year ending on or before June 22, 1959, was May 31, 1959. As of May 31, 1959, we have found as a fact that petitioner did not have any dealer reserve income which should have been taken into account for such taxable year.

Section 5(a) of the Act defines "Dealer Reserve Income" as follows:

DEALER RESERVE INCOME.—For purposes of this Act, the term "dealer reserve income" means—

(1) that part of the consideration derived by any person from the sale or other disposition of customers' sales contracts, notes, and other evidences of indebtedness (or derived from customers' finance charges connected with such sales or other dispositions) which is—

(A) attributable to the sale by such person to such customers, in the ordinary course of his trade or business, of real property or tangible personal property, and

(B) held in a reserve account, by the financial institution to which such person disposed of such evidences of indebtedness, for the purpose of securing obligations of such person or of such customers, or both; and

(2) that part of the consideration—

(A) derived by any person from a sale described in paragraph (1)(A) in respect of which part or all of the purchase price of the property sold is provided by a financial institution to or for the customer to whom such property is sold, or

(B) derived by such person from finance charges connected with the financing of such sale,

which is held in a reserve account by such financial institution for the purpose of securing obligations of such person or of such customer, or both.

Prior to petitioner's establishing its own finance division, a large portion of the customers' obligations was sold to financial institutions. Instead of paying the petitioner the entire sales price, the financial institutions would hold a portion back and credit a reserve account in favor of petitioner. Accordingly, up to November 18, 1958, petitioner had dealer reserve income which qualified under the Act. However, on November 18, 1958, petitioner purchased all the customers' obliga-

tions it had sold[23] and the reserve accounts were eliminated. The portion of the finance charges which was still not accrued at the end of the fiscal year (May 31, 1959) after being reduced by the finance charges which were picked up in income between November 18, 1958, and the end of the fiscal year (installment notes falling due during that period), was $46,891.27. Of necessity, this latter amount included the $3,228.92 which as of November 18, 1958, represented petitioner's portion of finance charges from current year's sales which had not been accrued by petitioner. The $3,228.92 was once part of the dealer reserve account. The latter account was closed when petitioner purchased its customers' obligations originally sold to the financial institutions. The total unearned finance charges in dealer reserve accounts as of November 18, 1958, was $67,271.98, which included the $3,228.92 referred to above. As of May 31, 1959, the total unearned finance charges attributable to the customers' obligations purchased by petitioner were reduced to $46,891.37. This amount the parties stipulated was properly deferrable and not includable in income for the fiscal year just ended. Therefore, petitioner did not have, as of May 31, 1959, any dealer reserve income which should have been taken into account for such taxable year. Accordingly, petitioner does not qualify as a person to whom the Act applies.[24]

Petitioner argues that the parties stipulated that "as of May 31, 1959, petitioner had deferred and had not accrued $3,228.92" which represented dealer reserve income properly accruable during the fiscal year but deferred by petitioner. It, therefore, concludes that respondent is not in a position to argue that petitioner does not qualify as a "person" under section 2(2) of the Act. We find no merit in this argument. We do not accept poor draftsmanship in the wording of a stipulation as indicating respondent's concession of the very point in issue. It seems more logical to us that the meaning of the particular paragraph referred to by petitioner should be obtained from the entire stipulation and this is what we have done. *Frank Handfield*, 23 T.C. 633 (1955). Furthermore, where there is an ambiguity in the stipulation or where different parts of the stipulation appear to be inconsistent, any interpretation which removes the ambiguity and inconsistency will be adopted. *M. Pauline Casey*, 38 T.C. 357, 377 (1962).[25]

---

[23] With the slight exception noted in fn. 22, *supra*.

[24] The unearned finance fee attributable to the one note not purchased by petitioner (see fn. 22, *supra*) totaled $65.65 as of May 31, 1959. At first glance, it would appear that this amount could qualify as dealer reserve income as defined in sec. 5 of the Act. However, petitioner does not argue that it qualifies nor does petitioner argue that because of this amount it qualifies as a person under sec. 2 of the Act. For this reason and for the further reason that the record is void of any information regarding this note, we are compelled to disregard the $65.65 in our consideration of this issue.

[25] Cf. Rule 31(b)(6), Tax Court Rules of Practice, where this Court may set aside a stipulation in whole or in part where justice requires.

Moreover, even if petitioner qualified as a "person" under section 2 of the Act, it still cannot obtain the benefits of the Act under the particular provision of section 3(b) it claims is applicable to determine the "year of the change."

Section 3 of the Act, under which petitioner elected, provides as follows:

SEC. 3. ELECTION TO HAVE SECTION 481 APPLY.

(a) GENERAL RULE.—If—

(1) for the year of the change (determined under subsection (b)), the treatment of dealer reserve income by any person to whom this Act applies is changed to a method proper under the accrual method of accounting (whether or not such person initiated the change),

(2) such person makes an election under this subsection, and

(3) such person does not make the election provided by section 4(a),

then, for purposes of section 481 of the Internal Revenue Code of 1954, the change described in paragraph (1) shall be treated as a change in method of accounting not initiated by the taxpayer.

(b) Year of Change, Etc.—In applying section 481 of the Internal Revenue Code of 1954 for purposes of this section, the "year of the change" in the case of any person is—

(1) except as provided in paragraph (2), the first taxable year ending after June 22, 1959, or

(2) the earliest taxable year (whether the Internal Revenue Code of 1954 or the Internal Revenue Code of 1939 applies to such year) for which—

(A) on or before June 22, 1959—

(i) the Secretary of the Treasury or his delegate issued a notice of deficiency, or a written notice of a proposed deficiency, with respect to dealer reserve income, or

(ii) such person filed with the Secretary or his delegate a claim for refund or credit with respect to dealer reserve income, and

(B) the assessment of any deficiency, or the refund or credit of any overpayment, whichever is applicable, was not, on June 21, 1959, prevented by the operation of any law or rule of law.

For purposes of this section, section 481 of such Code shall be treated as applying to any year of the change to which the Internal Revenue Code of 1939 applies.

Petitioner argues that the "year of the change" is determined for this case under section 3(b)(2)(A)(i) of the Act. Petitioner then argues that its fiscal year ended May 31, 1956, is the "year of the change" since a written notice of a proposed deficiency was received with respect to that year and since that year was the earliest taxable year for which the assessment of any deficiency or the refund of any overpayment was not, on June 21, 1959, prevented by operation of law. Petitioner does not argue, nor was there any evidence introduced to indicate that the "year of the change" might be governed by section 3(b)(1) of the Act. Accordingly, our decision on this issue is limited to the question as to whether, under the facts of this case, petitioner qualifies under section 3(b)(2)(A)(i).

We agree with petitioner that as of June 22, 1959, petitioner's earliest taxable year for which the assessment of any deficiency was

not prevented by the operation of any law or rule of law was the fiscal year ended May 31, 1956. Therefore, in order for petitioner to prevail, it must show that a "notice of deficiency, or a written notice of a proposed deficiency" was issued with respect to that year. Petitioner received a 10-day letter from the Internal Revenue Service dated December 31, 1957, which proposed certain adjustments to the fiscal years ended May 31, 1955, May 31, 1956, and May 31, 1957. We are only interested in May 31, 1956. The effect of the proposed adjustments for the fiscal year ended May 31, 1956, was to reduce the net operating loss for such year. This did not constitute a deficiency or a proposed deficiency. Sec. 6211, I.R.C. 1954.[26] The letter sent to petitioner regarding the fiscal year ended May 31, 1956, did not inform the petitioner of a deficiency or a proposed deficiency, but just informed it that the claimed operating loss would be reduced because of certain proposed adjustments. Accordingly, we find that petitioner has not received a notice of deficiency for the earliest taxable year prior to June 22, 1959, for which a proposed deficiency or overpayment was not, on June 21, 1959, barred from assessment or refund by operation of law.[27]

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BRUCE and DRENNEN, *JJ.*, concur in the result.

_____

WITHEY, *J.*, dissenting: I must dissent from the holding of the majority for the reason that I believe its conclusion does fundamental damage to long-standing precepts of accrual basis reporting of income.

The parties are agreed that for present purposes the petitioner is to be treated as a taxpayer which keeps its books and reports its income on the accrual basis of accounting. Under the method of accounting employed by petitioner it accrued on its books for the year of a given sale the selling price of the vehicle sold by it on the deferred payment plan and also the cost of insurance and the filing fees incurred by it in making such a sale. However, the finance charge made by petitioner and involved in such sale was not similarly accrued but was credited by petitioner to a deferred income account on its books.

_____

[26] SEC. 6211. DEFINITION OF A DEFICIENCY.

(a) IN GENERAL.—For purposes of this title in the case of income * * * taxes, imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A and B exceeds the excess of—

    (1) the sum of

        (A) the amount shown as the tax by the taxpayer upon his return, * * * plus

        (B) the amounts previously assessed * * * as a deficiency, over

    (2) the amounts of rebates * * *

[27] In view of our holding on this issue, we find it unnecessary to determine whether the 10-day letter in this case qualifies as a written notice of proposed deficiency. But see *American Community Builders, Inc.,* 36 T.C. 364 (1961), revd. 301 F. 2d 7 (C.A. 7, 1962).

At the end of the year of the sale the petitioner made a charge to the deferred income account of an amount computed by it as the portion of the finance charge allocable to such year and accrued on its books and reported as income for the year the amount of such charge. A similar method was employed by petitioner for subsequent taxable years until the full amount of the finance charge had been accrued on its books and reported as income. Since the petitioner did not elect to report income by the use of the installment method as provided by section 453 of the Code of 1954 and since there is no controversy as to the correctness of the petitioner's accrual of the selling price of the vehicle and the petitioner's expenditures for insurance and filing fees in the year of the sale of a vehicle, it was incumbent on the petitioner to establish a factual basis that would warrant its action in not also accruing on its books in the year of the sale the full amount of the finance charge instead of crediting the amount to a deferred income account. In my opinion the petitioner has failed to establish such basis. The showing that the amount of the finance charge was based on a credit report on each particular customer reflecting the factors usually considered in determining whether a credit sale is to be made and, if so, the proper amount thereof, does not aid the petitioner. Such a showing would equally support the conclusion that the finance charge was merely a segregated portion of the selling price charged because of the risk and the costs of administrative handling involved in making a credit sale to the particular customer on a deferred payment plan.

Accrual basis taxpayers are axiomatically required to report income on the basis of the legal liability of others to pay where the amount of the liability can be determined with *reasonable accuracy*, not, as the majority opinion holds, an amount which is *absolutely fixed. Continental Tie & L. Co.* v. *United States*, 286 U.S. 290 (1932); *Cappel House Furnishing Co.* v. *United States*, 244 F. 2d 525 (C.A. 6, 1957); *George K. Herman Chevrolet, Inc.*, 39 T.C. 846 (1963); sec. 1.446-1(c)(1)(ii), Income Tax Regs. The creation of the liability fixes the time of accrual which in this case is the execution and delivery of the promissory note of the payor coupled with delivery to him of the merchandise, the purchase price of which is represented by the note. In this case there is no condition existing precedent to the fixing of such liability and accrual. The majority opinion wrongly pivots decision upon the happening of a condition which does not exist at the time of accrual and can only occur subsequent thereto if at all. See *Smith* v. *Commissioner*, 324 F. 2d 725 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *William M. Davey*, 30 B.T.A. 837 (1934), petition for review dismissed 88 F. 2d 1008 (C.A. 9, 1937). This does violence to long-established principles set forth in such

cases as *Spring City Co.* v. *Commissioner*, 292 U.S. 182 (1934), wherein the Supreme Court places the issue here presented in proper perspective in the following language:

Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. When a merchandising concern makes sales, its inventory is reduced and a claim for the purchase price arises. Article 35 of Regulations 45 under the Revenue Act of 1918 provided: "In the case of a manufacturing, merchandising, or mining business 'gross income' means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources."

On an accrual basis, the "total sales," to which the regulation refers, are manifestly the accounts receivable arising from the sales, and these accounts receivable, less the cost of the goods sold, figure in the statement of gross income. *If such accounts receivable become uncollectible, in whole or part, the question is one of the deduction which may be taken according to the applicable statute.* * * * [Emphasis supplied.]

The right of an accrual basis taxpayer to deduct amounts of cash discounts uncollected because of early payment of the purchase price has long been established. *American Cigar Co.*, 21 B.T.A. 464 (1930), affd. 66 F. 2d 425 (C.A. 2, 1933), certiorari denied 290 U.S. 699 (1933). The amount uncollectable in this case because of early payment is in principle the same as the rebate or discount in cash discount cases and it seems to me the majority opinion, if correct, has the necessary result of overruling such cases.

The concept of "earned income" heavily stressed in the majority opinion was considered and given short shrift in *Brown* v. *Helvering*, 291 U.S. 193 (1934). Once amounts become income because of the method of accounting and reporting of the taxpayer, their taxability may not be deferred on the grounds they have not been earned. *Brown* v. *Helvering, supra.*

In *Commissioner* v. *Hansen*, 360 U.S. 446 (1959), the Supreme Court said:

The principles governing the accrual and reporting of income by taxpayers who employ the accrual basis have long been settled by the opinions of this Court. *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281; *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182; *Brown* v. *Helvering*, 291 U.S. 193. * * *

By the foregoing statement of the Court it has shown its regard for the cases mentioned therein and the principles settled by those cases. Surely here we should show like regard for those cases and the principles established therein by applying the principles of *Brown* v. *Helvering, supra,* and *Spring City Co.* v. *Commissioner, supra,* which are particularly applicable.

The majority merely conjectures as to whether the involved "finance charge" is, in whole or in part, interest which of course would be re-

portable only as ratably accrued under the facts of this case. The burden to prove this fact, however, was clearly that of the petitioner. The burden was such as to leave no room for conjecture. Such facts as are proven coincide as well with the fixing of a finance charge on the basis of risk and the cost of administrative handling as upon an interest concept. Indeed, it is noted that interest is not the subject of any of the written obligations herein nor is it mentioned in the State statute referred to in the majority opinion. Both sources refer to the amount to be credited to the purchaser as a rebate or refund. To me this language presupposes payment or accrual to the seller from which an amount is repaid or credited to the purchaser.

Decision should be entered for respondent.

TIETJENS, PIERCE, and MULRONEY, *JJ.*, agree with this dissent.